**Thomas SELTZER, Plaintiff,**

**v.**

**I.C. OPTICS, LTD., I.C. Optics S.P.A., Defendants.**

**IC Optics, Ltd., Counter claimant,**

**v.**

**Thomas Seltzer, Counter defendant.**

**Civil Action No. 03cv01536 (JLL).**

United States District Court, D. New Jersey.

July 11, 2004.

Frederick B. Polak, Esq., Post, Polak, Goodsell, MacNeill & Strauchler, P.A., Roseland, NJ, for Plaintiff.

Shea Lukacsko, Esq., Grotta, Glassman & Hoffman, P.A., Roseland, NJ, for Defendants.

### OPINION AND ORDER

LINARES, District Judge.

This matter comes before the Court on the motion of Defendant I.C. Optics S.p.A.

("ICO SpA") to dismiss Plaintiff Thomas Seltzer's complaint against it pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. Seltzer commenced this action in the Essex County Superior Court following the termination of his employment at ICO SpA's New Jersey subsidiary, I.C. Optics Ltd. ("ICO Ltd.") It was removed to this Court on April 8, 2003. The motion is resolved without oral argument. Fed.R.Civ.P. 78. For the reasons stated herein, ICO SpA's motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(2) is GRANTED.

## BACKGROUND

### A. The Dispute

Plaintiff Thomas Seltzer is a resident of West Orange, New Jersey. ICO SpA is an international business headquartered in Italy, which is engaged in the business of manufacturing and selling luxury eyewear. ICO Ltd. is a subsidiary of ICO SpA, headquartered during the relevant time period in West Caldwell, New Jersey.[1]

In late 2001 and early 2002, ICO Ltd.'s President and CEO, Frank Karloczy, allegedly induced Seltzer to leave his position as Executive Vice–President of Business Development of a software technology company to serve as ICO Ltd.'s Managing Director of its Retail Division. Seltzer's principal work responsibilities were to include sales management, merchandising, marketing and operations. Seltzer served in this capacity from May 2002 to September 2002. Following Karloczy's termination as CEO, Plaintiff was made ICO Ltd.'s Chief Operating Officer and Managing Director. In February 2003, because of a contract dispute that is the basis of the present lawsuit, Seltzer was terminated.

### B. Corporate Structure

ICO Ltd. is ICO SpA's North American distributor for Versace and Versus eyeglasses. ICO Ltd. purchases these products at wholesale prices from ICO SpA and resells them to various retailers. ICO SpA owns 77 percent of ICO Ltd.'s stock. ICO Ltd. and ICO SpA both advertise in national trade and consumer publications. ICO Ltd. maintains a separate corporate and financial identity from its Italian parent. ICO Ltd. maintains its own offices, operating personnel, computer systems, inventory, and payroll. It also prepares and maintains its own set of books, bank accounts, financial statements, and tax returns. ICO SpA asserts that, with the exception of three small shipments of sunglasses to New Jersey boutiques, the only direct contact it had with New Jersey is through its distributor relationship with ICO Ltd.[2] Other than the normal influence exercised by a majority shareholder, ICO SpA maintains that it has not been involved in ICO Ltd.'s day-to-day activities.

ICO SpA, however, does not permit its subsidiary to operate without any guidance or intervention. For instance, the record contains a number of communications between the chairman of ICO SpA, Lorenzo Cremona, and Seltzer and other ICO Ltd. executives regarding various employment matters. (Polak Aff., Ex. Q.) One fax message from Cremona, in particular, chastises Karloczy for entering into

---

**1.** ICO Ltd. is not involved in this motion, as it does not contest this Court's jurisdiction.

**2.** There is some dispute over exactly how this distributor relationship operates. Seltzer believes that ICO SpA shipped certain inventory to ICO Ltd. on a consignment arrangement, where ICO Ltd. only paid for products if and when they were sold to customers. (Seltzer Aff., ¶ 21.) ICO Ltd.'s Chief Financial Officer asserts, to the contrary, that all merchandise was booked as inventory upon receipt and title passed to ICO Ltd. at that time. (Gugenti Aff., ¶ 5.)

an employment agreement with Seltzer that departed from the terms Cremona had originally agreed to. (*Id.*) The record contains another memo from Cremona to Karloczy regarding the proper sale and pricing of certain eyeglass products. (*Id.*, Ex. T.)

The most contentious allegations surrounding ICO SpA's relationship with ICO Ltd. relate to the activities of Antonio Gentilini, ICO SpA's Sales Manager. On August 28, 2002, the ICO Ltd. Board of Directors passed a resolution granting Gentilini general administrative authority, in conjunction with Karloczy, over the corporation.[3] (*Id.*, Ex. R.) For 26 weeks during the months of March, April, June, July, August, September, November, and December 2002, Gentilini worked at ICO Ltd.'s New Jersey offices. His general practice was to visit for two or three weeks, then return to Italy for two or three weeks, and so on. Precisely which company Gentilini was representing during these visits is a matter of dispute between the parties. Seltzer "understood Gentilini to be an ICO SpA representative sent by Cremona to ICO Ltd.'s New Jersey office to oversee operations." (Seltzer Aff., ¶ 8.) Seltzer also asserts that it "was generally understood at ICO Ltd.'s New Jersey office that ICO SpA controlled ICO Ltd.'s management and operations" and that he and other employees reported directly to Gentilini on various management matters, including Seltzer's concerns regarding his employment contract. (*Id.* at ¶ 12.) Seltzer also alleges that Gentilini held himself out to third parties as representing ICO SpA during meetings with various ICO Ltd. customers. ICO SpA, on the other hand, characterizes Gentilini's primary purpose in New Jersey as overseeing ICO Ltd.'s operations on behalf of ICO Ltd.'s

Board of Directors Lorenzo Cremona and Fernando Cremona, who served on the Boards of both corporations. (Guagenti Aff., ¶ 11.)

## C. Procedural History

On February 28, 2003, less than a month after his termination, Seltzer brought this action against ICO Ltd., ICO SpA, Luxottica Group SpA, Luxottica U.S. Holdings Corp., Luxottica USA Inc., Luxottica Sun Corp., and Avant–Garde Optics, LLC, alleging (1) breach of employment contract, (2) wrongful termination in violation of employment contract, (3) unjust enrichment, (4) breach of covenant of good faith and fair dealing, (5) discriminatory discharge based on age in violation of New Jersey Law Against Discrimination, N.J.S.A. 10:5–12, (6) fraudulent inducement of employment, and (7) wrongful interference with Seltzer's employment contract. On December 19, 2003, Defendants ICO SpA, Luxottica Sun Corp., and Avant Garde Optics moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(c) and 12(b)(2). After the motion was filed, on December 15, 2003, Luxottica and Avant Garde were voluntarily dismissed by Seltzer, as was the Rule 12(c) motion. Thus, the only issue at bar is the Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction over ICO SpA. Pursuant to Magistrate Judge Hedges' April 5, 2004 pre-trial discovery order, Seltzer filed supplemental discovery materials relating to the 12(b)(2) motion on June 9, 2004 and ICO SpA responded on June 23, 2004.

## DISCUSSION

### A. ICO SpA's Motions to Preclude Certain Parts of Seltzer's Evidence

Prior to addressing ICO SpA's motion to dismiss pursuant to Rule 12(b)(2), it is

---

**3.** Apparently it is common in Italy for individual directors and non-officer employees to receive specific authorization from the Board of Directors to act as officers or managers for certain tasks and objectives. (Maroni Aff., ¶ 27.)

necessary to address several objections to elements of the Seltzer and Polak affidavits and the June 9, 2004 supplemental filings that ICO SpA raised in its original brief and its response to Seltzer's supplemental filings. These objections generally involve allegations that certain information is precluded by the Federal Rules of Evidence, and that Seltzer failed to disclose certain information prior to and during discovery.

### 1. *Evidentiary Objections*

■ Once the defendant moves to dismiss for lack of personal jurisdiction, "plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence." *Patterson v. FBI*, 893 F.2d 595, 603–03 (3d Cir.1990). ICO SpA raises numerous evidentiary objections to much of Seltzer's supporting affidavits. In particular, ICO SpA argues that most of Seltzer's assertions based on his personal knowledge are precluded by Federal Rule of Evidence 602, which prohibits testimony on a matter "unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed.R.Evid. 602. However, Rule 602 also states that "evidence to prove personal knowledge may…consist of the witness' own testimony." (*Id.*) Examples of the statements that ICO SpA contests pursuant to Rule 602 include Seltzer's description of ICO Ltd.'s advertising procedures (Seltzer Aff., ¶ 19) and Gentilini's sales and management activities while at ICO Ltd.'s offices (*Id.* at ¶¶ 13–15). Seltzer has offered undisputed evidence that during the period in question, he was ICO Ltd.'s Managing Director–Retail Division, and then the company's Chief Operating Officer and Managing Director. (Seltzer Aff., ¶ 2.) This Court finds that a person in his position would have sufficient knowledge of company operations to support the assertions Seltzer makes in his affidavit. *See Teen–Ed., Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399 (3d Cir.1980) (plaintiff's accountant was permitted to testify about plaintiff's balance sheets because he testified that he had personally seen them); *In re Texas Eastern Transmission Corp. PCB Contamination Ins. Coverage Litig.*, 870 F.Supp. 1293 (E.D.Pa. 1992) (company employee was allowed to testify about company's historical practices after testifying that he had seen certain documents and vouched for their truthfulness).

ICO SpA also raises objections to Seltzer's proffered lay opinion testimony and argument pursuant to Rule 701. This Rule limits lay opinions or inferences to those which are: "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed.R.Evid. 701. Examples of the allegedly objectionable statements again include those relating to advertising (Seltzer Aff., ¶¶ 19, 20) and sales operations (*Id.* at ¶ 17). The lay opinion regarding customs of the trade and professional dealings has been permitted by witnesses who were engaged in those industries. *See, e.g., Winant v. Bostic*, 5 F.3d 767 (4th Cir.1993) (admitting the opinion of a state official, based on the official's prior professional dealings and discussions with the developer about necessary permits, that a developer should have known that a major development permit was required); *U.S. v. Gold*, 743 F.2d 800 (11th Cir.1984) (admitting the statement of the owner of an optical center that the volume of cataract eyewear sales at the optical center was excessive before he took over based on his own examination of the store's records and his own personal expe-

rience in the optical business). Certain statements that ICO SpA objects to, such as those outlining Seltzer's sales activities (*See, e.g.* Seltzer Aff., ¶ 17) are clearly not opinions or conclusions that fall under Rule 701. As to his assertions regarding the intent of the advertising, they are rationally based on his perceptions during his employment, are helpful to the determination of facts at issue, and are not "scientific, technical, or other specialized knowledge." Thus, the Rule 701 exclusions are inapplicable here.

Finally, regarding any possible hearsay objections pursuant to Rules 801 and 802, this Court will only consider assertions based on documents that are actually in the record. After examining the record, this Court concludes that the only statements that might constitute inadmissible hearsay are those attributed to Frank Karloczy by Seltzer. These statements will therefore be disregarded for the purposes of this motion. Regarding ICO SpA's objections to the admissibility of Exhibits P, Q, S, T, U, V, this Court finds that they all satisfy Rule 901(a), 802, and 602 and will therefore be considered in connection with this motion.

### 2. *Discovery Objections*

ICO SpA also raises several objections to the contents of Seltzer's affidavits pursuant to Federal Rule of Civil Procedure 37(c)(1). This rule states that

A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at trial, at a hearing, or on a motion any witness or information not so disclosed.

■ Fed.R.Civ.P. 37(c)(1). The leading Third Circuit case on discovery exclusions

is *Meyers v. Pennypack Woods Home Ownership Ass'n*, 559 F.2d 894 (3d Cir. 1977), *overruled on other grounds by Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir.1985). *Meyers* set forth several factors district courts are to weigh in deciding whether to exclude evidence as a discovery sanction, including:

(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the court's order.

■ *Astrazeneca AB v. Mut. Pharm. Co., Inc.*, 278 F.Supp.2d 491, 504 (E.D.Pa. 2003) (quoting *Meyers*, 559 F.2d at 904– 05). An important final consideration is the importance of the excluded testimony to the proffering party's case. *Id.* The *Meyers* court "stressed that the exclusion of 'critical' evidence" is an "extreme" sanction, "not normally to be imposed absent a showing of willful deception or 'flagrant disregard' of a court order by the proponent." *Id.* (quoting *Meyers*, 559 F.2d at 905).

■ After carefully reviewing the record in this case, this Court has not found any "willful deception" or "flagrant disregard" by Seltzer. Although some of Seltzer's disclosures and interrogatory responses might be slightly vague, the ultimate disposition of this motion shows that permitting the affidavits in question into the record would not unfairly prejudice ICO SpA. Nor could ICO SpA, based on the pleadings, disclosures, and interrogatories, have been surprised by, or unprepared for, the allegations made

in Plaintiff's affidavit. This case is unlike *Astrazeneca*, where the court prohibited a new theory of claim construction to be proffered by the defendants post-discovery because the plaintiff "had no reason to take discovery, investigate, or include this topic in discussions with its own experts." 278 F.Supp.2d at 507. *See also Southern States Rack and Fixture, Inc. v. Sherwin–Williams Co.*, 318 F.3d 592, 596 (4th Cir.2003) ("[the] basic purpose of Rule 37(c)(1) [is] preventing surprise and prejudice to the opposing party.") Since Seltzer's actions do not warrant the "extreme" sanction of preclusion, ICO SpA's request to exclude certain portions of Seltzer's affidavits is denied.

## B. *ICO SpA's Motion to Dismiss Pursuant to Rule 12(b)(2)*

Regardless of the evidentiary objections, ICO SpA has moved to dismiss the complaint against it pursuant to Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction. It argues that because all of the forum contacts relevant to this dispute occurred between Seltzer and ICO Ltd., New Jersey law forbids asserting jurisdiction over a corporate parent based only on the acts of its subsidiary. Seltzer counters by pointing to numerous contacts that ICO SpA, and its employees, officers, and directors had with New Jersey independent of their relationship with ICO Ltd. The main issue at bar, therefore, is whether these alleged contacts are sufficient to overcome the general presumption against holding a corporate parent liable for the acts of its subsidiary.

### 1. *Standard of Review*

Federal Rules of Civil Procedure 12(b)(2) states that a defendant may move to dismiss a complaint for "lack of personal jurisdiction." Fed.R.Civ.P. 12(b)(2). Once a defendant has asserted a motion to dismiss, the plaintiff carries the burden of "establishing with reasonable particularity sufficient contacts between the defendant and the forum state." *Provident Nat'l. Bank v. Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir.1987). The Third Circuit has held that "[w]hen a Defendant raises the defense of the court's lack of personal jurisdiction, the burden falls upon the plaintiff to come forward with sufficient facts to establish that jurisdiction is proper." *Mellon Bank (East) P.S.F.S., Nat'l Assn. v. Farino*, 960 F.2d 1217, 1223 (3d Cir.1992). In evaluating a movant's motion to dismiss pursuant to Federal Rule 12(b)(2), "courts must accept the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff." *Machulsky v. Hall*, 210 F.Supp.2d 531, 531 (D.N.J.2002) (citing *Carteret Sav. Bank, F.A. v. Shushan*, 954 F.2d 141, 142 n. 1 (3d Cir.1992)).

A district court may exercise personal jurisdiction over a nonresident of the forum only to the extent authorized by the forum state's long-arm statute. *M. Eagles Tool Warehouse v. Fisher Tooling*, 205 F.Supp.2d 306, 311 (D.N.J.2002). New Jersey's long-arm statute permits the exercise of personal jurisdiction over a nonresident defendant to the extent of the Fourteenth Amendment of the United States Constitution. N.J. Sup.Ct. R. 4:4–4(c)(1). *See also Weber v. Jolly Hotels*, 977 F.Supp. 327, 334 (D.N.J.1997). The Fourteenth Amendment requires (1) that the "defendant ha[ve] constitutionally sufficient 'minimum contacts' with the forum," *id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)), and (2) that "subjecting the defendant to the court's jurisdiction comports with 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326

U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

A court may exercise either "general" or "specific" personal jurisdiction over a defendant. General jurisdiction is based upon the defendant's "continuous and systematic" contacts with the forum state. *Eagles Tool Warehouse*, 205 F.Supp.2d. at 312 n. 8 (citing *Remick v. Manfredy*, 238 F.3d 248, 255 (3d Cir.2001)). Specific jurisdiction arises only when the plaintiff's claim is related to, or arises out of, the defendant's contacts with the forum. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

## 2. General Personal Jurisdiction over ICO SpA

█ It is well-established in New Jersey that the forum contacts of a subsidiary corporation will not be imputed to a parent corporation for jurisdictional purposes without a showing of something more than mere ownership. *See State, Dep't of Environ. Prot. v. Ventron Corp.*, 468 A.2d 150, 164 (N.J.1983); *Leo v. Kerr–McGee*, 1996 WL 254054, *5 (D.N.J. May 10, 1996); *Pfundstein v. Omnicom Group Inc.*, 285 N.J.Super. 245, 666 A.2d 1013, 1016 (1995) (citing cases). In this context, courts in this Circuit will consider "whether the subsidiary was merely the alter ego or agent of the parent, and whether the independence of the separate corporate entities was disregarded." *Lucas v. Gulf & Western Indus., Inc.*, 666 F.2d 800, 806 (3rd Cir.1981). *See also Cannon Mfg. Co. v. Cudahy Co.*, 267 U.S. 333, 336–37, 45 S.Ct. 250, 69 L.Ed. 634 (1925) (finding that although a Maine corporation dominated and controlled a wholly-owned corporation with offices in North Carolina, the two corporations were distinct corporate entities so that the Maine corporation was not amenable to suit in North Carolina). Therefore,

determining whether the acts of ICO Ltd. may be attributed to ICO SpA for jurisdictional purposes depends on whether the former is deemed to be the "agent" or "alter ego" of the latter. *See, e.g., Patent Incentives, Inc. v. Seiko Epson Corp.*, 1988 WL 92460, *4 (D.N.J. Sept. 6, 1988).

### a. Agency

█ An agency relationship arises "when one party consents to have another act on its behalf, with the principal controlling and directing the acts of the agent." *Sears Mortgage Corp. v. Rose*, 134 N.J. 326, 634 A.2d 74, 79 (1993). Agency doctrine recognizes a distinction between a "servant" and an "independent contractor." *AT & T v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1435 (3d Cir. 1994). A master-servant relationship is created "if the employer assumes the right to control the time, manner, and method of executing the work, as distinguished from the right merely to require certain definite results in conformity to the contract." *Id.* (internal quotes omitted). On the other hand, an independent contractor "is not subject to that degree of physical control, but is only subject to the general control and direction by the principal. . . ." *Id.* While a principal is vicariously liable for the tortious acts of the servant, it is not similarly liable for those of the independent contractor. *Id.*

In the corporate context, courts have said that the subsidiary may be acting as an agent of the parent, and thereby able to subject the parent to personal jurisdiction in the forum, if the subsidiary is doing business in the forum that would otherwise have to be done in the forum by the parent. *Leo*, 1996 WL 254054 at *6. In *Tsegaye v. Impol Aluminum Corp.*, for example, the subsidiary did not have "any power to sign contracts on behalf of [the parent] or to bind it in any way," and the

subsidiary "does not place or accept orders on behalf of" the parent. 2003 WL 221743, *5 (S.D.N.Y. Jan. 30, 2003). Therefore, "because it cannot be said that [the subsidiary] can do all of the business [the parent] could do were its own officials present in New York," an agency relationship did not exist. *Id.*

■ Viewing these general principles of agency in light of the *Ventron* policy limiting the liability of corporate parents, ICO Ltd. cannot be seen as the agent of ICO SpA. Although ICO SpA may have required ICO Ltd. to perform within certain parameters, it did not control the day-to-day time, manner, and method of executing the work. Thus, ICO Ltd. was the corporate equivalent of an independent contractor, rather than a servant. ICO SpA is therefore not vicariously liable for the acts of ICO Ltd.

Moreover, while ICO Ltd. was ICO SpA's distributor, it was not empowered to act on behalf of its parent. This is clearly illustrated by Cremona's August 30, 2002 letter to Karloczy, where he specifically disclaims any liability on the part of ICO SpA for ICO Ltd.'s contract with Seltzer because the terms differed from those he had agreed upon. (Polak Aff., Ex. Q.) Additionally, ICO SpA's sale of sunglasses to the New Jersey boutique stores indicates that ICO SpA engaged in sales to this forum independent of ICO Ltd. Finally, the fact that ICO Ltd. and ICO SpA each conducted its own advertising further belies any finding of an agency relationship.

b. *Alter Ego*

■ In New Jersey, a subsidiary will be deemed to be the alter ego or "mere instrumentality" of its parent if "the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent." *Ventron,* 468

A.2d at 164 (citations omitted). *See also Craig v. Lake Asbestos of Quebec, Ltd.,* 843 F.2d 145, 150 (3d Cir.1988) ("It is patently clear since *Ventron* that in New Jersey even the exercise of significant control by the parent over the subsidiary will not suffice to pierce the corporate veil.") Courts will consider factors such as (1) the level of capitalization of the subsidiary; (2) who the subsidiary does business with other than the parent; (3) the day-to-day involvement of the parent's directors, officers and personnel with the subsidiary; and (4) the payment of the subsidiary's salaries and expenses by the parent. *See Ventron,* 468 A.2d at 164; *Environ. Tectonics v. W.S. Kirkpatrick & Co.,* 659 F.Supp. 1381 (D.N.J.1987). Liability generally requires that the parent corporation "abused the privilege of incorporation by using the subsidiary to perpetuate a fraud or injustice, or otherwise to circumvent the law." *Patent Incentives,* 1988 WL 92460, at *6 (citing *Ventron,* 468 A.2d at 164).

■ A parent's domination or control of its subsidiary cannot be established by overlapping boards of directors. *See United States v. Bestfoods,* 524 U.S. 51, 69, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) ("It is a well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership."); *Leo,* 1996 WL 254054, at *6 ("A significant degree of overlap between directors and officers of a parent and its subsidiary does not establish an alter ego relationship.") There is a general presumption "that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary," so dual office holding alone in not enough to establish liability. *Bestfoods,* 524 U.S. at 69, 118 S.Ct. 1876 (quoting P. Blumberg, *Law of Corporate*

*Groups: Procedural Problems in the Law of Parent and Subsidiary Corporations* § 1.02.1, p. 12 (1983)). This presumption is strongest when the officer's dual activities are "perfectly consistent with the norms of corporate behavior, but wanes as the distance from those accepted norms approaches the point of action by a dual officer plainly contrary to the interests of the subsidiary yet nonetheless advantageous to the parent." *Id.* at 70 n. 13, 118 S.Ct. 1876.

In applying the alter ego test, the New Jersey Supreme Court in *Ventron* concluded that although the parent's "personnel, directors, and officers were constantly involved in day to day business," the parent's intrusion into the subsidiary's affairs had not reached "the point of dominance." 468 A.2d at 165. The *Ventron* court believed this was especially so since the parent incorporated the subsidiary "for a legitimate business purpose." *Id.* Likewise, in *Patent Incentives,* the district court concluded that it could not assert personal jurisdiction over a foreign parent, even though there was significant overlap in directors and involvement of the parent's officers in the affairs of the subsidiary, because the "[p]laintiffs have simply failed to come forward with any evidence to suggest that the relationship between [the Japanese parent and its American subsidiary] is anything other than a bona fide parent/subsidiary relationship which legitimately insulates one [from] the liabilities of the other." 1988 WL 92460 at *8 (quoting *Smith v. Dainichi Kinzoku Kogyo Co., Ltd.,* 680 F.Supp. 847 (W.D.Tex.1988)). Finally, in *Pfundstein,* all of the parent's subsidiaries "(a) [kept] their own books and bank accounts; (b) file[d] their own income tax returns; (c) [were] managed by their own boards of directors; (d) [made] their own personnel, marketing and management decisions; (e) direct[ed] their own day-to-day operations; and (f) otherwise operate[d] as independent companies." 666 A.2d at 1017. Although the parent "control[ed] the operations of the subsidiaries," the subsidiaries were given "fairly wide discretion" to meet the profitability targets set by the parent. *Id.* Based on these factors, the court concluded that the parent "simply does not exercise unusual hegemony over its subsidiaries, or dominate and control them so as to, in effect, disregard their independent corporate existence." *Id.*

■ Applying the *Ventron* standard here, this Court must conclude that ICO SpA's control over ICO Ltd. did not reach the "point of dominance." In support of his contention that ICO SpA exerted an abnormal amount of control over ICO Ltd., Seltzer points to numerous communications from Lorenzo Cremona and Gentilini on ICO SpA letterhead and from ICO SpA e-mail accounts to ICO Ltd. management regarding ICO Ltd. operations. These contacts are insufficient for this Court to assert *in personam* jurisdiction over ICO SpA. Although the record does show that Cremona and Gentilini did exert a considerable amount of influence and control over ICO Ltd., even if this Court accepts all of Seltzer's assertions as true, their activities did not deviate from the normal amount of control a parent has over its subsidiary. It is undisputed that ICO Ltd. maintained its own finances, accounts, books, offices, clients, and so forth. Under the *Bestfoods* "two hats" analysis, Cremona's service on the boards of both corporations and Gentilini's temporary service as a quasi-officer of ICO Ltd. does not establish jurisdiction over ICO SpA. Most importantly, nothing in the record indicates that ICO SpA abused the parent/subsidiary relationship to perpetrate any criminal or tortious wrongdoing.

■ Seltzer also suggests that ICO SpA's advertising in New Jersey should count towards contacts establishing personal jurisdiction. However, national advertisements not directed at a particular forum, and advertisements which are not direct solicitations, but rather merely "spread knowledge of defendant's facilities among the general public," have not been sufficient to establish jurisdiction. *Giangola v. Walt Disney World Co.*, 753 F.Supp. 148, 155 (D.N.J.1990). *See Gehling v. St. George's School of Medicine, Ltd.*, 773 F.2d 539, 542 (3d Cir.1985) (national advertisements in the *New York Times* and *Wall Street Journal* were insufficient to establish personal jurisdiction over the defendant). *See also Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Cooperative*, 17 F.3d 1302, 1305 (10th Cir.1994) ("evidence of mere placement of advertisements in nationally distributed papers or journals does not rise to the level of purposeful contact with a forum required by the Constitution in order to exercise personal jurisdiction over the advertiser"); *Singletary v. B.R.X., Inc.*, 828 F.2d 1135, 1136 (5th Cir.1987) ("advertising in national publications is not in itself sufficient to subject a defendant to personal jurisdiction"). As the *Giangola* court pointed out, "[i]n an age of modern advertising and national media publications and markets," holding that "such conduct would make a defendant amenable to suit wherever the advertisements were aired would substantially undermine the law of personal jurisdiction." *Id.* at 156. Because these advertisements are not direct solicitations, but rather are placed in national media publications and markets, they do not establish jurisdiction over ICO SpA. Thus, this Court cannot assert general personal jurisdiction over ICO SpA based on either its corporate relationship with ICO Ltd. or its New Jersey advertisements.

### 3. Specific Personal Jurisdiction over ICO SpA

■ In addition to trying to establish that this Court has general personal jurisdiction over ICO SpA through its parent/subsidiary relationship, Seltzer also argues that ICO SpA had certain contacts that establish specific personal jurisdiction. Specifically, Seltzer points to evidence in the record indicating that Cremona and Gentilini were involved in the employment decisions that led to the present contract dispute. Based on the aforementioned jurisprudence that limits the liability of a parent corporation for the acts of the subsidiary, this Court concludes that these contacts were not sufficiently outside the scope of normal business operations to pierce the *Ventron* liability shield.

Other contacts which Seltzer points to include the small shipments of eyeware to the New Jersey boutiques, the alleged consignment arrangement for inventory with ICO Ltd., and Gentilini and Seltzer's solicitation of clients on behalf of ICO SpA. Had these contacts been related to the present contract dispute, they might be sufficient to establish specific jurisdiction pursuant to the "stream of commerce" analysis. The Court need not make this determination, since the contacts are unrelated to this contract dispute. As such, they do not serve as a basis for specific personal jurisdiction and do not reach the level of "continuous and systematic" contacts with New Jersey that general jurisdiction requires.

Even if Seltzer could establish sufficient minimum contacts, this Court would still be unable to assert personal jurisdiction over ICO SpA because doing so would not comport with "traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316, 66 S.Ct. 154. In this regard, courts must evaluate: (1) the burden on the defendant, (2) the forum State's interest in adjudicating the dispute, (3) the

plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174. In dealing with foreign defendants, in particular, the Supreme Court has warned that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." *Asahi Metal Indus. Co. v. Superior Court of California,* 480 U.S. 102, 115, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). As it appears that ICO SpA itself committed no tortious or illegal acts, New Jersey has little interest in haling them into court in this state. Nor would keeping ICO SpA in this lawsuit substantially advance Seltzer's interest in obtaining convenient and effective relief based on his contract dispute with ICO Ltd. Finally, forcing ICO SpA, an Italian corporation, to litigate in New Jersey would impose a substantial burden on that foreign defendant. Accordingly, this Court concludes that asserting personal jurisdiction over ICO SpA would be an unnecessary and overly burdensome extension of this Court's authority.

Having looked at all of the evidence in the record in the light most favorable to Seltzer, and considering New Jersey's strong presumption against attributing a subsidiary's forum contacts to its corporate parent, this Court cannot find any basis on which to assert *in personam* jurisdiction over ICO SpA. Therefore, ICO SpA's motion to dismiss pursuant to Rule 12(b)(2) is GRANTED.

## CONCLUSION

For the foregoing reasons set forth above, it is on this *11TH* day of July, 2004,

**ORDERED** that Defendant ICO SpA's motion to dismiss Plaintiff's Complaint against it pursuant to Fed.R.Civ.P. 12(b)(2) is hereby GRANTED.

It is so ordered.