903 A.2d 475 (2006)
387 N.J. Super. 160
Antonia VERNI, an infant, by her guardian ad litem, Albert BURSTEIN, and Fazila Baksh Verni, Individually, Plaintiffs-Respondents,
v.
HARRY M. STEVENS, INC. of New Jersey, Aramark Services Management of New Jersey, Inc., Aramark Corporation, and Aramark Sports and Entertainment Group, Inc., Defendants-Appellants, and
Daniel R. Lanzaro, Ronald A. Verni, The New Jersey Sports & Exposition Authority, New York Giants, Giants Stadium, Shakers, The Gallery, Michael Holder, Elrac, Inc. d/b/a Enterprise Rental Car, Toyota Motor North America, Inc., Paul Smith, National Football League, and Paul Tagliabue-Commissioner, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued May 30, 2006.
Decided August 3, 2006.
*483 Steven A. Cozen argued the cause for appellants Harry M. Stevens, Inc., and Aramark Services Management of New Jersey, Inc. (Cozen O'Connor, attorneys; Mr. Cozen, Thomas McKay, III, Elizabeth Chambers Bailey, and Ruth Greenlee, on the brief).
David W. Field, Roseland, argued the cause for appellants Aramark Corporation and Aramark Sports and Entertainment Group (Lowenstein Sandler, attorneys; Michael L. Rodburg, Mr. Field, and Priya Rebecca Masilamani, on the brief).
David A. Mazie argued the cause for respondents (Nagel, Rice & Mazie, attorneys; Mr. Mazie, of counsel and on the brief; David M. Freeman and Randee M. Matloff, Roseland, on the brief).
Before Judges CUFF, PARRILLO and GILROY.
The opinion of the court was delivered by
CUFF, P.J.A.D.
On October 24, 1999, plaintiffs Antonia Verni and Fazila Baksh Verni were severely injured when a car driven by defendant Daniel Lanzaro collided with the *484 car driven by defendant Ronald A. Verni. Antonia was two years old at the time of the accident. Lanzaro had spent the afternoon at Giants Stadium and at two bars after he left the stadium. He was intoxicated at the time of the collision.
Following a lengthy trial, a jury found that Lanzaro had been served beer at Giants Stadium when he was visibly intoxicated. The jury also found that Lanzaro and the Aramark defendants were equally responsible for the injuries caused by the collision. The jury awarded compensatory damages to Antonia in the amount of $53,950,000 and to Fazila, her mother, in the amount of $6,500,000. The jury also awarded $75,000,000 in punitive damages, $65,000,000 of which was awarded to the child and $10,000,000 to her mother. The judgment against Aramark Corporation, Aramark Sports and Entertainment Group, Inc., Aramark Services Management of New Jersey, Inc. and Harry M. Stevens, Inc. of New Jersey totals $109,667,750. Due to multiple errors in the course of the trial, we reverse and remand for a new trial.
On December 14, 2000, plaintiffs Antonia Verni and Fazila Verni filed a complaint seeking compensatory and punitive damages against Lanzaro, Ronald Verni, the New Jersey Sports & Exposition Authority (Sports Authority), Giants Stadium, the New York Giants, Aramark and/or Aramark, Inc.; two bars frequented by Lanzaro after the game, Shakers and The Gallery; and Michael Holder, the passenger in Lanzaro's car. After Aramark, Inc. filed an answer in the name of Harry M. Stevens, Inc. of New Jersey, improperly pleaded as Aramark and/or Aramark, Inc., plaintiffs amended their complaint to assert a claim against Harry M. Stevens t/a Aramark. Harry M. Stevens was the owner of the stadium liquor license and the concession contract. Thereafter, a series of amended complaints were filed. At the time of trial, the beverage server defendants were identified as Harry M. Stevens, Inc. of New Jersey (HMS) and Aramark Services Management, Inc. (ASM). ASM employed the beer servers. Due to settlements and orders granting summary judgment, the remaining defendants at the time of trial were HMS, ASM and Shakers. Prior to trial, the trial judge reserved decision on a motion by defendants HMS and ASM to resolve the issue of the applicability of the Beverage Server Act to ASM. Under the Licensed Alcoholic Beverage Server Fair Liability Act (Beverage Server Act), N.J.S.A. 2A:22A-1 to -7, HMS, as the licensed alcoholic beverage server, was entitled to limit plaintiffs' proofs to whether HMS served Lanzaro when he was visibly intoxicated. Plaintiffs argued that ASM was not an agent of HMS; therefore, it could pursue a common law negligence claim against ASM that allowed more expansive proofs. On January 7, 2005, on the third day of testimony on defendants' case, the trial judge ruled that ASM was an agent of HSM; therefore, plaintiffs could not pursue a common law negligence claim versus defendants. At this point in the proceedings, the jury had heard the following evidence.
At approximately 11:00 a.m. on October 24, 1999, Lanzaro and Michael Holder arrived at Giants Stadium where the men attended a football game. Lanzaro admitted that he did not clearly remember all of the events of the day but recalled that while tailgating before the game, he had consumed two or three of the eight twelve-ounce beers he had in his truck. He described himself as a binge drinker.
The men entered the stadium at approximately 12:30 p.m. for the 1:00 p.m. kickoff. Lanzaro, who had purchased his ticket from a scalper, did not sit with Holder. Rather, he sat in the third or upper tier in *485 section 310. Lanzaro admitted that during the first half of the game he purchased two or more sixteen ounce light beers from an unidentified individual operating a concession stand in the upper tier. Lanzaro "guzzl[ed]" the beer, drinking approximately one beer every ten minutes, and "never had an . . . empty hand," claiming he was "drunk" by the end of the first quarter.
Just before halftime, at approximately 2:30 p.m., Lanzaro left his seat and walked down the "spirals," the ramps leading to the different stadium levels, to meet Holder. En route, Lanzaro, who said he was "shit-faced," purchased "four or more" sixteen ounce light beers from an unidentified individual operating a portable beer cart in the lower level spiral. Lanzaro claimed he told the server how many beers he wanted and then "duked" or tipped the server an extra ten dollars to bypass the stadium's two-beer limit. Although Lanzaro could not recall his conversation, he said he had not been abusive, vulgar, or disrespectful because he wanted to be served, explaining that "if you're a happy drunk, people give you beer. If you're a disrespectful drunk, they cut you off."
Lanzaro walked approximately fifty to seventy-five feet to meet George Lanzaro, his brother, Lisa Lanzaro, his sister-in-law, and Holder in the spiral by Gate D. George and Lisa, who had been sitting with Holder, confirmed that Lanzaro walked toward them carrying six sixteen-ounce beers. George claimed that Lanzaro appeared to be intoxicated because he had "a blank sta[re] look," was animated, loud, and had "a very slight sway." Lisa confirmed that Lanzaro appeared intoxicated because he was slurring his words, using rapid hand movements while talking, "his eyes were drunk . . . [l]ike floating eyeballs," and he "cupped" his cigarette. Lisa said she gave Lanzaro a sandwich because she "thought he was drunk." Neither Lisa nor George Lanzaro observed Lanzaro purchase the beer. Holder testified at trial that he could not recall whether Lanzaro had appeared intoxicated but admitted that at depositions he had testified that Lanzaro had not seemed drunk.
In any event, Lanzaro maintained that he drank only one or two of the beers he bought in the spiral and offered the rest to his family. Lanzaro then left and purchased marijuana in the spirals from an unidentified individual, but claimed he only had a "couple of hits" because he "was too drunk." He admitted, however, that he likes to smoke marijuana because it makes him "feel a little bit more drunk."
Plaintiffs produced no witnesses that actually observed Lanzaro purchasing beer at the stadium on the date of the accident, nor did they submit any internal reports that showed sales to visibly intoxicated persons on that date. For example, the reports prepared by various employees for that date revealed, in relevant part that: cashier number two in section 108 sold more than two beers to a customer; a cashier at stand 204 on the Mezzanine level sold six beers to a customer; and a bartender was the subject of a disciplinary report for consuming a beer while on duty. Moreover, all of the beer servers who were working in the vicinity of Spiral D had no recollection of serving Lanzaro and further claimed they had not served, or observed service of, visibly intoxicated customers.
Nevertheless, Officer Corey Lange of the Hasbrouck Heights Police Department, who was not present at the stadium on the date in question but who had reported to the scene of the accident, testified in uniform that during the approximately ten games he had attended sometime prior to 1999, he observed many visibly intoxicated people, including some of his friends, served beer, and had *486 never seen anyone refused service. Lange said he stopped attending the Giants games in 2001 because he did not "want to be bothered dealing with the problems that occur in the stadium." Similarly, Lanzaro testified that he had been served at prior games at Giants Stadium when he was visibly intoxicated and that he had never been refused service. Holder also represented that he had been served beer at the stadium while visibly intoxicated.
Lanzaro and Holder left the stadium sometime around the beginning of the third quarter. Lanzaro drank a beer in the parking lot before driving to Shakers, a go-go bar. While there, Lanzaro ordered a light beer, but claimed he had only "a couple sips" because he was "done," meaning intoxicated, and then he and Holder left. Lanzaro drove to a liquor store where Holder bought a six-pack of beer and a bottle of champagne, which they brought to The Gallery, another go-go bar. The Gallery did not have a liquor license but allowed their patrons to bring alcohol. It provided cups, ice and service. Lanzaro and Holder remained at The Gallery for approximately forty minutes during which time Lanzaro admitted he may have consumed a beer, but said that he and Holder did not drink the champagne because it was for the dancers. Gunther Bilali, the owner of The Gallery, set forth in deposition testimony read to the jury that he was not present at the time, but the hosts at his establishment would not allow a visibly intoxicated patron to enter. After leaving The Gallery, Lanzaro drove to a fast food restaurant where he and Holder ate.
At approximately 5:47 p.m., shortly after leaving the restaurant, Lanzaro swerved across the lane of traffic and struck the 1999 Toyota Corolla driven by Ronald Verni. The parties stipulated that "Lanzaro's driving was the cause of the accident." Upon arrival at the scene, Officer Lange and Patrolman Thomas Barnett of the East Rutherford Police Department observed that Fazila was in the back seat "wedged behind the driver" and that Antonia, age two, who was also in the back seat, was unconscious.
Lange said that Lanzaro, who was standing on a "corner in a daze," appeared to be intoxicated. He noted that Lanzaro was swaying, his eyes were bloodshot, his hand movements were fumbling and slow, his face was flushed, and there was a "strong odor" of alcohol on his breath. Sergeants George Netelkos and George Shihanian of the Hasbrouck Heights Police Department, who arrived shortly after the accident, observed that Lanzaro was intoxicated. On a scale of one-to-ten, Netelkos described Lanzaro's level of intoxication as a ten. A test taken at 6:25 p.m. confirmed that Lanzaro had a blood-alcohol concentration (BAC) of .266 percent. Lanzaro was arrested, subsequently convicted of vehicular assault, and sentenced to a five-year term.
Fred DelMarva, plaintiffs' expert in the area of service and training relating to alcohol service, opined that defendants violated the applicable industry standard of care in failing to properly train their employees by requiring them to be TIPS certified. He explained that the six-hour-long Training for Intervention Procedure for Servers (TIPS) program effectively teaches alcohol servers how to spot behavioral cues of intoxicated patrons, and asserted that a study showed that TIPS-trained servers never served customers who had a BAC exceeding .10 percent. However, only 59% of beer servers, 21% of cashiers, and 0% of the alcohol compliance officers at the stadium were TIPS certified.
*487 Moreover, according to DelMarva, various reports and checklists revealed that HMS and ASM violated their alcohol service policy on the date of the accident and on many other dates. He explained that defendants' "standard practice" was to serve visibly intoxicated people and not to serve only those patrons who were "excessively intoxicated." He maintained that HMS and ASM also violated the TIPS policy, which instructs servers to only sell one twelve-ounce beer per transaction, not two sixteen-ounce beers.
Furthermore, Dr. Richard Saferstein, plaintiffs' expert toxicologist, testified that at approximately 2:30 p.m. on October 24, 1999, Lanzaro was visibly intoxicated when he was served beer at the stadium. Saferstein maintained that an average person would exhibit signs of visible intoxication at a .10 percent BAC. Those signs include poor body gait, inability to stand and walk properly, poor muscular coordination, slow and unsteady hand movement, and "perhaps but not necessarily slurred speech and . . . being boisterous and loud." Saferstein also cited to a study where 100 percent of TIPS-trained alcohol servers recognized individuals with a .10 percent or higher BAC as visibly intoxicated. He conceded, however, that "tolerant" drinkers, or individuals who have become acclimated to alcohol, generally do not exhibit signs of visible intoxication at a .10 percent BAC. He concluded, however, based in part on Lisa and George's observations that Lanzaro appeared intoxicated at halftime, that Lanzaro was not a tolerant drinker. Moreover, when an individual's blood alcohol level rises rapidly, as in this case, the signs of intoxication are generally exacerbated.
Saferstein stated that at the time of the accident Lanzaro weighed one-hundred and forty-five pounds, and thus calculated that, assuming Lanzaro began drinking at 11:15 a.m., he would have had to consume the equivalent of sixteen twelve-ounce light beers over the course of the day to reach a.266 percent BAC by 6:25 p.m. Assuming Lanzaro drank three regular twelve-ounce beers in the parking lot before the game, and one beer after he left the stadium, he would have had to consume eight sixteen-ounce light beers while in the stadium. At that rate of consumption, Lanzaro would have reached a .10 percent BAC by approximately 1:30 p.m., .15 percent BAC by 2:10 p.m., and .16 to .18 percent BAC by the time he left the stadium. Thus, Saferstein concluded that Lanzaro was visibly intoxicated when he was served at the stadium, and was still intoxicated at Shakers and The Gallery.
Furthermore, according to Saferstein, even if Lanzaro had consumed three beers before the game and three beers after the game, he still would have had to consume seven sixteen-ounce light beers in the stadium, and would have reached a .10 percent BAC at 1:45 p.m. Moreover, even assuming Lanzaro was a "tolerant" drinker and showed less signs of intoxication, at his BAC level he would have been visibly intoxicated at halftime. Saferstein admitted, however, that Lanzaro would not have been visibly intoxicated at halftime if he had consumed three beers prior to entering the stadium and then had only consumed two more beers during the first half of the game.
In support of their case, plaintiffs submitted evidence of non-compliance by HMS and ASM of alcohol service policies. They presented a document signed by a portable beer stand tender on October 16, 2004, entitled "ARAMARK Giants Stadium Alcohol Policy," which provided in part that "[a]ny person with signs of extreme intoxication will be refused service of alcoholic beverages by server" (emphasis added). In addition, Sharyn Matthews, *488 human resource manager for the Meadowlands Sports Complex, testified that a bartender could sell one beer, instead of two, to a customer who was starting to show signs of intoxication if he or she was "uncomfortable serving two beers." Similarly, Patrick Eggberg, a compliance officer hired in June 1999, testified that if a customer appeared to be intoxicated, he "would make sure that they were ID'd and that they were only served the two-beer limit . . . [o]r that they weren't served at all if they appeared to be too intoxicated." Michael D. Frey, another compliance officer, testified that a customer who was slightly intoxicated, but otherwise not causing any problems, would be served alcohol at the stadium. Nevertheless, Chris Findley, one of the concessions managers; Nicholas Valdez, a compliance officer; Shihanian, another compliance officer and one of the police officers who arrived at the scene; and Richard Roper, vice president of concessions at the Meadowlands; in addition to several beer servers and other compliance officers, testified that defendants' policy in October of 1999 was not to serve anyone who was visibly intoxicated.
In their defense, HMS and ASM presented evidence of the alcohol service policy at the stadium. John Mara, Executive Vice President of the New York Giants, testified that generally, 75,000 to 80,000 people attend each of the sold-out Giants home football games per season.[1] Giants Stadium and the Sports Authority allowed alcohol to be consumed at pre- and post-game tailgate parties in the parking lot, and hired security guards to monitor that area. In addition, they submitted expert testimony on the issue of whether Lanzaro would have appeared intoxicated when he purchased beer in the stadium.
Robert Pandina, defendants' expert in toxicology and addictive behavior, opined that Lanzaro, who he characterized as a tolerant or experienced drinker, had a .13 percent BAC at halftime, when he was last served alcohol. At that level, Lanzaro would not have exhibited any visible signs of intoxication. Pandina explained that his calculation was based on the assumption that Lanzaro drank three regular beers before the game, one regular beer in the parking lot after the game, a few sips of beer at Shakers, and two to four beers and a glass of champagne at The Gallery. Based on those assumptions, Pandina concluded that Lanzaro would have consumed approximately three-and-a-half sixteen-ounce beers in the stadium. Pandina admitted, however, that without accounting for alcohol tolerance, even an untrained individual could notice signs of intoxication at a .15 percent BAC.
Similarly, Herbert Moskowitz, defendants' expert in behavioral toxicity, opined that Lanzaro was "relatively tolerant to alcohol" and would not have shown signs of visible intoxication at .12 percent BAC. He explained that Lanzaro "had a very extensive drinking history" and thus was less likely to show signs of gross intoxication at lower levels because he would have learned to control his behavior. And he criticized Saferstein's citation to the TIPS study, explaining that the study only demonstrated that the program "worked very effectively in a situation where you have continual intermittent contacts with the individual drinking and you can observe them over long periods and. . . observe how much they're drinking." Moskowitz was also critical of Saferstein's failure to account for Lanzaro's marijuana use, noting that "marijuana has a powerful *489 interactive effect with alcohol in increasing the impairment."
Finally, Gil Fried, defendants' expert in stadium risk management, opined that defendants' policies met and exceeded industry standards. Fried, who admitted that he was not a strong proponent of the TIPS program, found that defendants had appropriately trained their employees on the job. He conceded, however, that the failure to provide any training to alcohol-servers would constitute a breach of the applicable standard of care.
In 1999, the alcohol service policy at Giants Stadium included a two-beer limit per transaction, a prohibition against serving minors and patrons who were visibly intoxicated, and cessation of beer sales at the start of the third quarter. The alcohol service policy was communicated to employees through the "Serves You Right" program, in which employees were given instructions regarding alcohol awareness during orientation through signs, clipboard reminders, and pre-game instructions, and through participation in the TIPS program.
Stephen Musciano, the former General Manager of Aramark who oversaw the entire Aramark operation at Giants Stadium, explained that the TIPS program taught beer servers how to "identify visibly intoxicated people." Beer servers were responsible for enforcing the alcohol service policies, and these positions were considered "premium" jobs and were usually filled by senior, experienced union members. Joseph Pistone, the developer of the "Serves You Right" program, believed defendants' policy was to have all beer servers TIPS certified. A corporate memo dated March 29, 1999, confirmed that "[a]ll management staff and service personnel are to be Tips trained."
However, Musciano, who originally represented at deposition that all of the beer servers were TIPS certified, conceded at trial that although that was the corporate goal, in fact, not all of the beer servers were certified. Nonetheless, he believed "that most of them if not all of them had experience in alcohol management through the union." Moreover, Mathews testified that from 1998 to 2004 she had trained over 500 employees in the TIPS program.
In an effort to facilitate and check the beer servers' compliance with the stadium's alcohol service policies, approximately twenty-five alcohol compliance officers, who were not TIPS certified but were generally retired or off-duty police officers, were positioned throughout the stadium. The officers were required to fill out an "Alcohol Compliance Checklist" for every game. Plaintiffs submitted into evidence forty-two alcohol compliance checklists from 1997 to 2004, which revealed that the alcohol service policy had been violated on numerous occasions. For example, in a checklist dated December 5, 1999, the officer reported that a bartender was advised of the two-beer limit on three occasions, and another bartender was observed serving four beers to patrons throughout the first quarter.
Additionally, four undercover individuals or spotters were also positioned throughout the stadium to document violations of the alcohol service policy. Plaintiffs submitted into evidence seventeen spotters' reports dated from 1997 to 2000, which again revealed that the policies had been violated. For example, in a report dated December 13, 1999, one of the spotters reported three separate instances where a beer server sold more than two beers to a patron, and several instances where a beer server allowed patrons to pour their own beers.
Musciano, who represented during depositions that he was unaware of any of these *490 violations, admitted that the beer servers should have been disciplined, and that records of any disciplinary action would have been placed in the employee's file. However, defendants produced only seven incident reports for the years 1997 to 1999, and eleven "Notice of Disciplinary Action" reports for the years 1997 to 2000.

I
HMS and ASM[2] argue that the trial judge erred in admitting evidence of a "culture of intoxication" at the stadium. They urge that such evidence is irrelevant to the central issue in a claim against a licensed beverage server and that admission of such evidence caused undue prejudice to HSM and ASM. We agree and further hold that the error caused sufficient prejudice to the Aramark defendants and thus, a new trial is required.
By order dated November 19, 2004, the motion judge denied plaintiffs' pre-trial motion to bar ASM from raising any defense based on the Beverage Server Act. Similarly, the trial judge deflected ASM's motion at the commencement of trial to resolve the application of the Beverage Server Act to it. The judge determined that he would allow evidence of agency, as well as evidence in support of a common law negligence claim against ASM, to be admitted at trial. He ruled that he would determine the agency issue at the appropriate time and issue a limiting instruction, if one was required.
On January 5, 2005, at the conclusion of plaintiffs' case, the trial judge denied defendants' Rule 4:40-1 motion and deferred a ruling on the agency status of ASM. He said, "the issue of negligence will arise if and when I make a decision on the issue of agency." Defendants commenced the presentation of their case on January 5, 2005. On January 7, the third day of the defense case, the judge ruled that ASM was an agent of HMS and that the Beverage Server Act governed its liability. At no time, however, did the trial judge issue a limiting instruction to the jury.
The Beverage Server Act provides the exclusive remedy for dram shop causes of action. N.J.S.A. 2A:22A-4; Fisch v. Bellshot, 135 N.J. 374, 382, 640 A.2d 801 (1994); Truchan v. Sayreville Bar and Rest., Inc., 323 N.J.Super. 40, 53, 731 A.2d 1218 (App.Div.1999). Common law claims arising out of the negligent service of alcoholic beverages are thus barred by the exclusivity provisions of the Beverage Server Act. Truchan, supra, 323 N.J.Super. at 53, 731 A.2d 1218. The statutory duty under the Beverage Server Act is set forth in N.J.S.A. 2A:22A-5, which defines negligence for purposes of civil liability as follows:
a. A person who sustains personal injury or property damage as a result of the negligent service of alcoholic beverages by a licensed alcoholic beverage server may recover damages from a licensed alcoholic beverage server only if:
(1) The server is deemed negligent pursuant to subsection b. of this section; and
(2) The injury or damage was proximately caused by the negligent service of alcoholic beverages; and

*491 (3) The injury or damage was a foreseeable consequence of the negligent service of alcoholic beverages.
b. A licensed alcoholic beverage server shall be deemed to have been negligent only when the server served a visibly intoxicated person, or served a minor, under circumstances where the server knew, or reasonably should have known, that the person served was a minor. (emphasis added.)
The Beverage Server Act is not only the exclusive remedy for a civil dram shop claim, N.J.S.A. 2A:22A-4, it also narrowly defines negligence as the service of alcohol to a visibly intoxicated patron. N.J.S.A. 2A:22A-5b. Therefore, negligence is not definable by reference to regulations or standards governing dispensers of alcoholic beverages or holders of liquor licenses. Fisch, supra, 135 N.J. at 383, 640 A.2d 801. The character of the place of dispensation is also inadmissible because it is irrelevant to the central issue. Truchan, supra, 323 N.J.Super. at 51-52, 731 A.2d 1218.
In Truchan, the defendant bar characterized itself as a family restaurant and contrasted itself to a nearby bar, which it referred to as a "dive." Id. at 51, 731 A.2d 1218. We held the evidence was irrelevant because "[w]hether Sayreville Bar was a `family restaurant' and [the nearby bar], or any other local establishment where [the patron and his friend] had been drinking earlier was characterized as a `dive' or a `shot and beer joint' does not have a tendency in reason to establish that Sayreville Bar would be less likely to serve a visibly intoxicated person." Id. at 51-52, 731 A.2d 1218. We further noted that any marginal relevance was outweighed by the risk of misleading the jury or undue prejudice. Id. at 52, 731 A.2d 1218. In Truchan, we also disallowed assertion of common law negligence claims based on wrongful hiring and supervision of tavern employees. Ibid. By implication, the admission of evidence of wrongful hiring, training or supervision of stadium employees would also be barred.
By failing to resolve the issue of ASM's role prior to the commencement of trial, the court allowed Lange, the first officer to respond to the accident, Lanzaro, Holder and many others to testify about the drinking environment at the stadium. They testified that they often saw visibly intoxicated people at football games; yet, there was no testimony that these intoxicated people had been served alcohol by the authorized beer sellers at the stadium. The judge also admitted evidence from Lange concerning rowdy behavior at the stadium. Plaintiffs were allowed to present evidence of incomplete training of servers and violations of service rules, such as allowing patrons to pour their own beer. The judge also admitted internal reports that revealed numerous violations of the alcohol service policy. The harm was compounded when the trial judge held that ASM was an agent of HMS and that the Beverage Service Act applied to ASM, and dismissed the common law negligence claim against ASM without issuing a limiting instruction to the jury to disregard the evidence that it had heard about the drinking environment, the negligent supervision of employees and the inadequate training of employees.
Relevant evidence is defined as "evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401. In this case relevance is also measured by the statutory standard governing liability of alcoholic beverage servers. Lanzaro and Holder testified that they were served alcohol while they were visibly intoxicated. Other witnesses, including Lange, testified that over the *492 years they observed people being served beer when visibly intoxicated. This evidence is relevant to the issue of whether defendants were likely to serve Lanzaro if he was visibly intoxicated. So, too, is a 2004 memo that stated the Aramark policy is not to serve beer to anyone extremely intoxicated, as well as testimony by Aramark employees that they would serve patrons who were slightly intoxicated.
On the other hand, there was a plethora of evidence about rowdy behavior at the stadium over the years and testimony of drunk patrons over the years. Evidence of rowdy behavior is similar to evidence of the character of the establishment, evidence that we found inadmissible in Truchan because it bore no relevance to the central issue of service to a visibly intoxicated patron. Similarly, evidence of drunken attendees is inadmissible because it does not account for the possibility that patrons may have consumed the alcohol off premises, before the game at a tailgate event, or that the alcohol was purchased by a sober patron who supplied it to an intoxicated patron.
Other evidence presented by plaintiffs may be marginally relevant to the ability or will of the beer dispensers to observe whether a patron is visibly intoxicated. This evidence includes violations of several alcohol service polices, including service of more than two beers to a single patron, consumption of alcohol by a server, and incomplete training of servers. This evidence, however, veers away from the statutory standard of visible intoxication and approaches the abrogated common law claims of negligent hiring, training and supervision of staff. Moreover, this evidence had the clear capacity to mislead the jury from the central and only issue of liability; that is, whether Lanzaro was served beer when he was visibly intoxicated.
By failing to resolve the issue of ASM's role prior to the commencement of trial, the trial judge allowed a plethora of references to the drinking environment, "a culture of intoxication," at the stadium that was not relevant to the limited issue of service to a visibly intoxicated person. The error was compounded by the absence of a jury instruction that all of the evidence admitted during plaintiffs' case in support of their common law negligence claim against ASM should be disregarded.
Plaintiffs argue that the trial judge cured any error in his charge at the end of the trial.[3] They refer specifically to the judge's charge, in which he instructed the jury that it could consider the evidence of violations of the two-beer policy and past service to other visibly intoxicated persons as evidence of HSM's and ASM's habit or routine practice. We disagree because that evidence was not admissible under N.J.R.E. 406.
N.J.R.E. 406 provides that
(a) Evidence, whether corroborated or not, of habit or routine practice is admissible to prove that on a specific occasion a person or organization acted in conformity with the habit or routine practice.
(b) Evidence of specific instances of conduct is admissible to prove habit or routine practice if evidence of a sufficient number of such instances is offered to support a finding of such habit or routine practice.
*493 Evidence of habit may thus support an inference that on a specific occasion a person acted in conformity with that habit. N.J.R.E. 406(a). In contrast, "[e]vidence of a person's character or character trait, including a trait of care or skill or lack thereof, is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion.. . ." N.J.R.E. 404(a).
The degree of specificity distinguishes habit from character evidence. Sharpe v. Bestop, Inc., 158 N.J. 329, 332, 730 A.2d 285 (1999). Thus, "[h]abit evidence depicts, with specificity, a routine practice in a particular situation." Showalter v. Barilari, Inc., 312 N.J.Super. 494, 512, 712 A.2d 244 (App.Div.1998). It involves a "regular practice of responding to a particular kind of situation with a specific type of conduct." Sharpe, supra, 158 N.J. at 330, 730 A.2d 285 (quoting State v. Radziwil, 235 N.J.Super. 557, 564, 563 A.2d 856 (App.Div.1989), aff'd o.b., 121 N.J. 527, 582 A.2d 1003 (1990)). "[B]efore a court may admit evidence of habit, the offering party must establish the degree of specificity and frequency of uniform response that ensures more than a mere `tendency' to act in a given manner, but rather, conduct that is `semi-automatic' in nature." Sharpe, supra, 158 N.J. at 332, 730 A.2d 285 (quoting Thompson v. Boggs, 33 F.3d 847, 854 (7th Cir.1994), cert. denied, 514 U.S. 1063, 115 S.Ct. 1692, 131 L.Ed.2d 556 (1995)). "Habit may be shown by evidence of a sufficient number of specific instances of conduct." Biunno, Current N.J. Rules of Evidence, comment 1 on N.J.R.E. 406 (2006).
For example, in Showalter, supra, the underage plaintiff was injured after drinking at the defendant's pub and sued under the Beverage Server Act. 312 N.J.Super. at 498, 712 A.2d 244. During the trial, the plaintiff and his brother testified that their underage friends had been served alcohol at the pub on various occasions. Id. at 510, 712 A.2d 244. On appeal, the court found the
only issue for which habit evidence arguably could have been relevant in this case was whether defendant had a practice of serving alcohol to minors in circumstances in which it knew or should have known their underage status, or that it simply did not care. N.J.S.A. 2A:22A-5. However, none of the testimony offered by plaintiff and his brother described the specific circumstances under which defendant allegedly served alcohol to the named individuals. No testimony demonstrated whether the appearance of those individuals should have indicated their underage status; whether they presented credible false identification; whether the individuals were personally known to the bartender; whether their drinks were purchased for them by someone of legal drinking age without defendant's knowledge; or whether defendant simply failed to request proper identification when it should have done so.
The trial court, therefore, erred when it admitted the testimony regarding other instances of service to minors for the impermissible purpose of proving "the general conduct" and "character" of the business and, specifically, that plaintiff was served alcoholic beverages and was underage. On remand, such evidence should be excluded unless the court determines in a N.J.R.E. 104 hearing that additional details are available such that the evidence rises to the level of habit. . . .
[Id. at 512-13, 712 A.2d 244.]
Similarly, such specificity was lacking in this case because the witnesses did not describe which beer servers had served the patrons, how many patrons had *494 been served, in which area of the stadium the patrons had been served, and whether the patrons exhibited signs of visible intoxication at the time of the purchase or appeared sober during the brief transaction. Moreover, it is unclear from this testimony whether these violations constituted occasional deviations amounting to inadmissible character evidence, or represented a sufficient number of instances to warrant a finding of habit or routine practice. Sharpe, supra, 158 N.J. at 332, 730 A.2d 285.
The admission of this evidence cannot be considered harmless. A central theme of plaintiffs' case was the culture of intoxication at the stadium. Plaintiffs' attorney referred to it in his opening, witness after witness were presented to speak about it, and plaintiffs' attorney emphasized the theme in his summation. The evidence had the clear capacity to mislead the jury, to inflame the jury and to detract from the central issue in the case of whether Lanzaro was visibly intoxicated at the time of service. On that issue, our review of the evidence suggests that there was sufficient evidence to submit the issue of service to a visibly intoxicated patron and to allow the jury to find that Lanzaro was visibly intoxicated at time of service. On the other hand, the evidence is not overwhelming. There is no direct evidence of service while visibly intoxicated to Lanzaro, who testified that he knew he had to behave as if he were sober in order to be served. Rather, plaintiffs' visible intoxication proofs were founded on the expert testimony of Dr. Saferstein and the observations of Lanzaro's brother, sister-in-law, and Holder (who was intoxicated himself) before and after he purchased the beer. Due to the less than overwhelming nature of plaintiffs' admissible evidence, we have no confidence that the jury was able to evaluate the relevant evidence in a dispassionate manner.

II
Before HSM and ASM rested, the trial judge granted plaintiffs' motion to amend the complaint to name Aramark Corporation (AC) and Aramark Sports and Entertainment Group, Inc. (ASEG) as additional defendants and to collectively label the four corporate defendants as Aramark. Neither AC nor ASEG were ever served with a summons and complaint, and an order memorializing the joinder was not entered until March 4, 2005, approximately five weeks after the jury returned its verdict. On appeal, AC and ASEG argue that they were severely prejudiced by the late joinder because they were not allowed to assert defenses and were denied due process.
In order to place this argument in context, it is necessary to review the procedural history of the litigation and examine the facts of record as they pertain to this issue. In December 2000, plaintiffs filed a complaint against "Aramark and/or Aramark, Inc." Aramark filed an answer as HMS "improperly pleaded as Aramark and/or Aramark, Inc." and plaintiffs subsequently amended their complaint to reflect this designation. In September 2004, plaintiffs moved to amend their complaint to add AC and ASEG, along with several other Aramark entities, arguing that based on the lack of discovery they were "constrained to seek leave to name every Aramark entity which could have been involved in operating the concessions at Giants Stadium. . . ." Plaintiffs represented that AC had produced some documents which confirmed that it was involved with operating the concessions at the stadium and that many of the deposed witnesses represented that they were employed by AC.
*495 On October 1, 2004, HMS amended its answers to interrogatories to include a chart depicting the relationship between AC and some of its subsidiaries, including ASM, which had supplied HSM with employees at Giants Stadium. In opposition to plaintiffs' motion, HMS represented that "Aramark is a trade name only. No corporation `Aramark' or `Aramark, Inc.,' exists." On October 8, 2004, plaintiffs voluntarily withdrew their motion, apparently based on defense counsel's representations regarding ASM. On that same date the court granted plaintiffs' request to name ASM as an additional defendant, but denied their motion to dismiss AC's answer for failure to comply with a discovery order, finding that notwithstanding the initial claim against Aramark, Inc., AC had not been included in the pleadings, had not filed an answer, and had been shown "to be an alter ego for any other defendant. Thus, there is neither a pleading nor affirmative defenses of Aramark Corporation to suppress."
Later, after depositions were conducted during the trial, plaintiffs again moved to amend the complaint to name AC and ASEG as defendants arguing that despite numerous discovery requests "it wasn't until during this trial that we finally learned that everything relating to the alcohol service policies, the training, the hiring and the firing, everything comes from Aramark Corporation down [in] Philadelphia." They further argued that joinder would allow them to present to the jury, on the punitive damage claim, AC's three-to-five billion dollars in assets.
The court conducted oral argument on January 11, 2005. The court granted the motion to add AC and ASEG without making any findings. The trial judge then granted plaintiffs' motion to collectively label the four corporate defendants as "Aramark."
On March 4, 2005, the court denied defendants' motion for a new trial and/or a judgment notwithstanding the verdict, setting forth that:
Aramark claims it was inappropriate . . . to add these entities as defendants during the trial. We heard reference to Rule 4:9-2. Also, the Court was referred to [Rule] 4:49-1, amendment of judgments adding parties if the evidence that had been presented warranted. In this case, I found that it did so warrant.
The court also "seem[ed] to recall somebody testifying that the money that they received from the service of beer went directly" into AC's bank account, and found that
[a]ll of the alcohol awareness policies, procedures, supervision, and training of the beer tenders working at Giants Stadium on the day of the accident were directed from the corporate headquarters in Philadelphia. . . .
Frederick Sutherland, the chief financial officer of Aramark Corporation, also confirmed that Aramark and Aramark Sports & Entertainment oversaw the concession operations at Giants Stadium and are involved in the supervision and management of these operations.[4]
Finally Brian Harris [defense counsel], on a prior occasion had made representations to the Court, in particular Judge Harris, that he represented all Aramark entities. In addition, Braff Harris represented Mr. Waddell, Mr. O'Hara, [and] Mr. Sutherland, all employees of Aramark Corporation and/or Aramark Sports & Entertainment Group at their depositions.
*496 In support of its decision, the court appears to have relied on Rule 4:49-2 and Rule 4:9-2. Neither rule, however, is applicable, because Rule 4:49-2 refers to a motion to amend a judgment, and Rule 4:9-2 refers to an amendment to conform the pleadings to the evidence involving a cause of action, affirmative defense, or legal theory, not an additional party.
Although motions to amend "are ordinarily afforded liberal treatment, the factual situation in each case must guide the court's discretion, particularly where the motion is to add new claims or new parties late in the litigation." Bonczek v. Carter-Wallace, Inc., 304 N.J.Super. 593, 602, 701 A.2d 742 (App.Div.1997), certif. denied, 153 N.J. 51, 707 A.2d 154 (1998). The denial of such a motion is "sustainable when made on the eve of trial, particularly if the motion seeks to add new parties." Pressler, Current N.J. Court Rules, comment 2.2.2 on R. 4:9-1 (2006). See Fisher v. Yates, 270 N.J.Super. 458, 467, 637 A.2d 546 (App.Div.1994) (holding no abuse of discretion in denying late motion to add new claims and parties); Du-Wel Prods., Inc. v. U.S. Fire Ins. Co., 236 N.J.Super. 349, 364, 565 A.2d 1113 (App.Div.1989) (denial of late motion to permit new claims and parties), certif. denied, 121 N.J. 617, 583 A.2d 316 (1990). See also Bonczek, supra, 304 N.J.Super. at 602, 701 A.2d 742 (finding no abuse of discretion in denial of motion to amend where the defendant's existence and corporate function were known). But see State, Dep't of Envtl. Prot. v. Std. Tank Cleaning Corp., 284 N.J.Super. 381, 396, 665 A.2d 753 (App. Div.1995) (finding that if claim does not arise until after complaint was filed, leave to amend should be granted if the moving party exercised due diligence and the amendment will not cause undue delay).
One of the factual situations to be considered by the trial court is the reason for the late filing. Bonczek, supra, 304 N.J.Super. at 602, 701 A.2d 742. Unfortunately here, the trial court made no findings. Prior to trial, plaintiffs were aware of AC's corporate structure, knew that many of HMS's and ASM's employees considered themselves employed by "Aramark," and had represented that AC was the employer of the concession workers. Moreover, plaintiffs voluntarily withdrew their pre-trial motion to add AC and ASEG, apparently satisfied that ASM, the employer of the beer servers, was the only other proper defendant. There is also no indication in this record whether plaintiffs sought discovery as to AC's and ASEG's control over the stadium's alcohol policies, although they repeatedly assert that their discovery requests were thwarted, and that they would have joined AC and ASEG earlier but for defendants' misleading conduct.
Based on the record before us, we cannot conclude that the late joinder severely prejudiced AC and ASEG because they were unable to assert the defense that Fazila's claim was barred by the two-year statute of limitations. The accident occurred on October 24, 1999, and plaintiffs' complaint was filed on December 14, 2000. The initial complaint named Aramark, Inc. as a defendant. AC sought at that time to substitute HMS as the proper party defendant. It is apparent that AC had notice of plaintiffs' claims within the two-year limitations period, unlike the NFL defendants who were not named until October 15, 2003, almost four years after the accident and almost two years after expiration of the statute of limitations.
On the other hand, we hold that the late joinder of AC and ASEG deprived each entity of notice of the nature of the claims against them and an opportunity to present a defense to those claims. We discern from the trial judge's ruling on *497 defendants' motion for a new trial that he allowed joinder on the basis that the record allowed a finding that AC, ASEG, ASM and HMS functioned as a single entity or that the record allowed him to pierce the corporate veil. This state does not recognize the former theory, and the record does not provide adequate support for the latter theory. Moreover, AC and ASEG were prejudiced by not being able to address the allegation that the facts required the court to disregard the corporate identities of HMS and ASM in order to provide an adequate remedy to plaintiffs.
Although motions for leave to amend are to be decided without consideration of the ultimate merits of the amendment, the determination must be made "'in light of the factual situation existing at the time each motion is made.'" Notte v. Merchants Mut. Ins. Co., 185 N.J. 490, 501, 888 A.2d 464 (2006) (quoting Interchange State Bank v. Rinaldi, 303 N.J.Super. 239, 257, 696 A.2d 744 (App.Div.1997)). Thus, "`courts are free to refuse leave to amend when the newly asserted claim is not sustainable as a matter of law. In other words, there is no point to permitting the filing of an amended pleading when a subsequent motion to dismiss must be granted.'" Ibid. (quoting Interchange, supra, 303 N.J.Super. at 257, 696 A.2d 744). See also Webb v. Witt, 379 N.J.Super. 18, 28-29, 876 A.2d 858 (App.Div.2005) (noting that where proposed cause of action is not sustainable as a matter of law, court may refuse leave to amend). "Lateness of the motion coupled with apparent lack of merit virtually dictates denial." Pressler, supra, comment 2.2.2. on R. 4:9-1.
Here it was undisputed that HMS held the liquor license and concession contract. It was also undisputed that ASM leased its employees to HMS, and that those employees actually operated the concession stands. Plaintiffs sought to join AC, the parent corporation, and ASEG, a group of subsidiaries formed to oversee AC's interests, but did not specifically argue that the court should pierce the corporate veil to do so, nor did defendants object on that basis. The trial judge's ruling on the amendment, however, is suffused with comments and references to legal principles that strongly suggest he granted the late amendment because the facts suggested a single enterprise or warranted piercing the corporate veil.
The single business enterprise or single entity rule has not been adopted in this state. Stochastic Decisions v. DiDomenico, 236 N.J.Super. 388, 393, 565 A.2d 1133 (App.Div.1989), certif. denied, 121 N.J. 607, 583 A.2d 309 (1990) and OTR Associates v. IBC Services, 353 N.J.Super. 48, 52, 801 A.2d 407 (App.Div.), certif. denied, 175 N.J. 78, 812 A.2d 1110 (2002), did not implicitly adopt the single enterprise test; instead, in both cases, the court cited to and applied the test for piercing the corporate veil set forth in State, Department of Environmental Protection v. Ventron, 94 N.J. 473, 468 A.2d 150 (1983).
It is well established that "a corporation is a separate entity from its shareholders . . . [and] a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise." Ventron, supra, 94 N.J. at 500, 468 A.2d 150 (citing Lyon v. Barrett, 89 N.J. 294, 300, 445 A.2d 1153 (1982)). Those "principles are equally applicable when the shareholder is, in fact, another corporation, and hence, mere ownership of a subsidiary does not justify the imposition of liability on the parent." Pearson v. Component Tech. Corp., 247 F.3d 471, 484 (3d Cir.), cert. denied, 534 U.S. 950, 122 S.Ct. 345, 151 L.Ed.2d 261 (2001). Thus, "[e]ven in the case of a parent corporation *498 and its wholly-owned subsidiary, limited liability normally will not be abrogated." Ventron, supra, 94 N.J. at 500, 468 A.2d 150. "In the absence of fraud or injustice, courts generally will not pierce the corporate veil to impose liability on the corporate principals." Lyon, supra, 89 N.J. at 300, 445 A.2d 1153. See Portfolio Fin. Serv. Co. v. Sharemax.com, Inc., 334 F.Supp.2d 620, 626 (D.N.J.2004) (liability will not be imposed on parent corporation merely because of its ownership of subsidiary).
Veil piercing is an equitable remedy whereby "the protections of corporate formation are lost" and the parent corporation may be found liable for the actions of the subsidiary. Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 215 F.Supp.2d 482, 497 (D.N.J.2002). In that regard, "piercing the corporate veil is not technically a mechanism for imposing `legal' liability, but for remedying the `fundamental unfairness [that] will result from a failure to disregard the corporate form.'" Trs. of the Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk, 332 F.3d 188, 193 (3d Cir.2003).
The issue of piercing the corporate veil is submitted to the factfinder, unless there is no evidence sufficient to justify disregard of the corporate form. G-I Holdings, Inc. v. Bennett, 380 F.Supp.2d 469, 477-78 (D.N.J.2005). See Morris v. Krauszer's Food Stores, Inc., 300 N.J.Super. 529, 542, 693 A.2d 510 (App.Div.) (finding error in charge on alter ego doctrine harmless because no evidence to justify disregard of corporate form), certif. denied, 151 N.J. 77, 697 A.2d 549 (1997); Quenet v. Revolinsky, 290 N.J.Super. 698, 708, 676 A.2d 622 (Law Div.1995) (finding no facts supporting alter ego argument). "[T]he party seeking an exception to the fundamental principle that a corporation is a separate entity from its principal bears the burden of proving that the court should disregard the corporate entity." Tung v. Briant Park Homes, Inc., 287 N.J.Super. 232, 240, 670 A.2d 1092 (App.Div.1996). We are persuaded that the record was insufficient to warrant the amendment under the theory of piercing the corporate veil. Notably, in this case, the effect of the amendment was a ruling that plaintiffs had submitted sufficient evidence to allow disregard of the corporate distinctions as a matter of law.
For example, in order to warrant piercing the corporate veil of a parent corporation, a party must establish two elements: 1) that the subsidiary was dominated by the parent corporation, and 2) that adherence to the fiction of separate corporate existence would perpetrate a fraud or injustice, or otherwise circumvent the law. Ventron, supra, 94 N.J. at 500-01, 468 A.2d 150. In determining whether the first element has been satisfied, courts consider whether "the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent." Id. at 501, 468 A.2d 150. See Interfaith, supra, 215 F.Supp.2d at 497 ("veil-piercing is proper when a subsidiary is an alter ego or instrumentality of the parent corporation"). In determining corporate dominance, courts engage in a fact-specific inquiry considering whether the subsidiary was grossly undercapitalized, the day-to-day involvement of the parent's directors, officers and personnel, and whether the subsidiary fails to observe corporate formalities, pays no dividends, is insolvent, lacks corporate records, or is merely a facade. Bd. of Trs. v. Foodtown, Inc., 296 F.3d 164, 172 (3d Cir.2002); Pearson, supra, 247 F.3d at 484-85; Marzano v. Computer Sci. Corp., 91 F.3d 497, 513 (3d Cir.1996); Solomon v. Klein, 770 F.2d 352, 353-54 (3d Cir.1985); Seltzer v. *499 I.C. Optics, Ltd., 339 F.Supp.2d 601, 610 (D.N.J.2004).
Plaintiffs argue on appeal that HMS and ASM were undercapitalized because they had a net worth of negative $14 million. Yet, there is no testimony on this issue, and the tax returns do not provide sufficient information to make such a determination. Generally, inadequate capitalization means
capitalization very small in relation to the nature of the business of the corporation and the risks . . . attendant to such businesses. The adequacy of capital is to be measured as of the time of formation of the corporation. A corporation that was adequately capitalized when formed, but which subsequently suffers financial reverse is not undercapitalized.. . . Adequate capitalization is a question of fact that turns on the nature of the business of the particular corporation. . . .
[1 William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 41.33 at 652 (perm.ed., rev.vol. 1999).]
This inquiry "is most relevant for the inference it provides into whether the corporation was established to defraud its creditors or other improper purpose such as avoiding the risks known to be attendant to a type of business." Trs. of the Nat'l Elevator Indus., supra, 332 F.3d at 197.
Here the record is devoid of any evidence as to the level of capitalization required for a corporation of ASM's and HMS's size to operate concession stands in a stadium, such as Giants Stadium. There is also no information as to the amount of initial capitalization, nor does the fact that the subsidiaries suffered a loss in 1999, the year of the tax return, mean they were undercapitalized. Moreover, undercapitalization is a key factor in determining corporate dominance.
With regard to day-to-day involvement, there was evidence that HMS used the Aramark trademark brand on its products and that some employees believed they were employed by Aramark. Additionally, the broad overall policies for alcohol awareness were directed by ASEG from AC's corporate headquarters, but HMS was responsible for implementing those policies. In fact, Michael O'Hara said that the officers of HMS and ASEG, not AC, directed the procedures and policies for the stadium. In addition, during the punitive damage trial Sutherland represented that AC, a huge multi-national corporation with approximately 150 subsidiaries, had regular reviews and meetings with some, not all, of the management companies, but not with the subsidiaries. Thus, there was insufficient evidence to establish that ASEG and AC were involved in day-to-day operations. Even if they were, that factor standing alone is insufficient to prove dominance. Ventron, supra, 94 N.J. at 501, 468 A.2d 150.
Similarly, although the officers of ASEG were also officers of the various corporate entities in the organization, including HMS and ASM, "[a] parent's domination or control of its subsidiary cannot be established by overlapping boards of directors." Seltzer, supra, 339 F.Supp.2d at 610. Moreover, the fact that HMS was acquired to hold the liquor license and stadium concession stand contract also does not establish dominance. See Ventron, supra, 94 N.J. at 501, 468 A.2d 150 (creation of a subsidiary for the sole purpose of acquiring the assets of another corporation does not establish dominance). Indeed, in this case Aramark employee Frederick Sutherland testified that Aramark, through various subsidiaries, holds multiple liquor licenses in numerous states and that the corporate organization *500 is designed to respond to the disparate regulatory schemes of the multiple jurisdictions.
With regard to finances, there was evidence that the concession stand money collected by HMS was deposited into a single central AC account from which a receivable was established. All revenues and liabilities of the subsidiaries were reported separately and there is no evidence that the funds were commingled. In fact, the subsidiaries filed their own tax returns. Moreover, although Sutherland testified that net income from the subsidiaries was reinvested into the business or paid out as dividends, it is unclear from his testimony whether the money was reinvested into the subsidiary, or into AC. There was also evidence that although the employees' paychecks read "Aramark," the checks contained a code number designating the subsidiary. Such centralized bookkeeping and accounting functions, without any evidence of commingling, is not in derogation of the separate existence of the subsidiaries.
There was, however, some evidence of corporate dominance because HMS had no employees, no income other than the Giants Stadium concession revenue, and no business premises of its own. Moreover, it appears that ASM shared the Philadelphia address of AC and provided employees solely to AC subsidiaries. However, plaintiffs presented no evidence that HMS and ASM had failed to observe corporate formalities, such as maintaining corporate records, filing annual reports, holding shareholders' meetings, paying dividends, and employing their own officers and directors. OTR Assocs., supra, 353 N.J.Super. at 55, 801 A.2d 407. Thus, while there was some degree of interdependence and integration between the parent corporation and the subsidiaries, on balance the evidence does not establish corporate dominance.
Moreover, plaintiffs have not established the second element, namely that "[e]ven in the presence of corporate dominance, liability generally is imposed only when the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law." Ventron, supra, 94 N.J. at 501, 468 A.2d 150. "[T]he hallmarks of that abuse are typically the engagement of the subsidiary in no independent business of its own but exclusively the performance of a service for the parent and, even more importantly, the undercapitalization of the subsidiary rendering it judgment-proof." OTR Assocs., supra, 353 N.J.Super. at 52, 801 A.2d 407. Here, while there is evidence that HMS and ASM did not engage in business of their own, there is insufficient evidence of undercapitalization and no evidence that AC acquired HMS, or created ASM, as a judgment-proof corporation for the sole purpose of insulating it from liability. In fact, there was evidence that HMS earned significant revenue from sales at the stadium, and Sutherland testified that AC formed its subsidiaries to enable it to operate in the various states; for example, some states require that an in-state corporation hold a liquor license. See OTR Assocs., supra, 353 N.J.Super. at 55, 801 A.2d 407 (finding veil piercing warranted where Blimpie created IBC as a judgment-proof corporation solely to insulate it from liability); Karo Mktg. Corp. v. Playdrome Am., 331 N.J.Super. 430, 443, 752 A.2d 341 (App.Div.) (holding fraudulent act of rendering wholly-owned subsidiary judgment-proof warranted piercing corporate veil), certif. denied, 165 N.J. 603, 762 A.2d 217 (2000).
Here, the record reveals not only that the late amendment caused prejudice to AC and ASEG because they received insufficient notice to assert a defense to *501 plaintiffs' claims but also that the record did not supply sufficient evidence to hold as a matter of law that the corporate distinctions between HSM, ASM, AC and ASEG must be disregarded. This error singly and in combination with the error discussed in Part I of this opinion requires a new trial.

III
HMS and ASM argue as plain error that the trial judge erred in instructing the jury that loss-of-enjoyment damages could include compensation for Antonia's shortened life expectancy. This was error and on retrial should be omitted from the charge.
The trial judge charged the jury as follows:
[i]f you find that Antonia will not live a full life due to her injuries you may increase Antonia's loss of enjoyment of life as Antonia was . . . entitled to be compensated for not being able to live her full life. In other words, when considering damages for loss of enjoyment of life you should consider the amount which Antonia's life may be shortened and you may compensate her for such losses.[5]
This was error.
A plaintiff "is permitted to recover loss of earnings based on life expectancy at the time of the injury, undiminished by any shortening of that expectancy as a result of the injury." Hall v. Rodricks, 340 N.J.Super. 264, 275, 774 A.2d 551 (App.Div.2001) (citing Sea-Land Servs., Inc. v. Gaudet, 414 U.S. 573, 594, 94 S.Ct. 806, 819, 39 L. Ed.2d 9, 26 (1974), impliedly overruled on other grounds by Miles v. Apex Marine Corp., 498 U.S. 19, 111 S.Ct. 317, 112 L. Ed.2d 275 (1990)). However, shortened life expectancy is not an element of loss of enjoyment of life damages in an action for personal injury. Paladino v. Campos, 145 N.J.Super. 555, 556-59, 368 A.2d 429 (Law Div.1976). See Downie v. U.S. Lines Co., 359 F.2d 344, 347 (3d Cir.) (finding per se rule not feasible because of incalculable variables in attempting to place a value on life), cert. denied, 385 U.S. 897, 87 S.Ct. 201, 17 L.Ed.2d 130 (1966); In re Joint E. & S. Dist. Asbestos Litig., 726 F.Supp. 426, 430 (D.N.Y.1989) (noting that a majority of American courts have rejected the shortening of life expectancy as an element of damages). See also Eyoma v. Falco, 247 N.J.Super. 435, 452, 589 A.2d 653 (App. Div.1991) (finding a comatose plaintiff can be compensated for the loss of enjoyment of normal activities).
The distinction between loss of enjoyment of normal activities and loss of enjoyment of the years taken from a person due to catastrophic injury may be narrow, but it exists. Contemplation of damages for a shortened life expectancy injects not only an incalculable element of damages, but also a plea to unbridled emotion that is not designed to produce a damage award free from passion. The instruction was erroneous and should not be repeated when the matter is retried.

IV
HMS and ASM also argue that they were prejudiced when a judge entertained and granted plaintiffs' pre-trial motions for summary judgment in favor of The Gallery, the settling football defendants, Holder and Ronald Verni. They contend that *502 the orders dismissing plaintiffs' claims against these defendants precluded HSM and ASM from seeking apportionment of liability. We agree and hold that these orders require reversal. If the evidence at the conclusion of the new trial warrants consideration of apportionment among any or all defendants in addition to HSM, ASM and Lanzaro, the jury must be allowed to apportion the liability among all defendants.
We consider this issue in two segments. First, we review the summary judgments sought by plaintiffs and entered in favor of the settling defendants. Then, we consider the non-settling defendants.

A. The Settling Defendants.
In May 2004, the NFL and Tagliabue, two of the football defendants, moved pursuant to Rule 4:6-2(e) to dismiss Antonia's negligence, vicarious liability, and public nuisance claims. Plaintiffs opposed the motion, arguing that defendants exercised control over the stadium, they permitted tailgating, and they had a duty to exercise reasonable care regarding the regulation and consumption of alcohol and illicit drugs within the stadium, and that the failure to do so created a reasonably foreseeable risk of a drunk-driving related injury. The court denied the motion.
A few months later, plaintiffs reached a settlement with the Sports Authority, the NFL, the New York Giants and Tagliabue, (the football defendants). On November 18, 2004, the court conducted a friendly hearing and approved an approximately $1 million dollar settlement: a $190,000 settlement between Antonio, ELRAC and Toyota, and a $701,250 settlement between Antonia and the football defendants.[6] In approving the settlement, the judge found that "there are substantial risks of receiving an adverse verdict or a dismissal at the end of plaintiff's case as to many if not all of the settling parties," and that the settlement was "well within the range of reasonableness."
The following day, the court heard argument on several motions, including plaintiffs' motion for summary judgment seeking dismissal of all claims against the football defendants. HMS opposed the motions, arguing that plaintiffs lacked standing and that the settling football defendants should remain on the verdict sheet for purposes of allocation. The court granted the motion and dismissed all claims, holding that the football defendants' conduct would not be the "subject of allocation." The jury ultimately apportioned fault between only Aramark and Lanzaro.
"New Jersey law favors the apportionment of fault among responsible parties." Boryszewski v. Burke, 380 N.J.Super. 361, 374, 882 A.2d 410 (App. Div.2005), certif. denied, 186 N.J. 242, 892 A.2d 1288 (2006). "The guiding principle of our State's comparative fault system has been the distribution of loss `in proportion to the respective faults of the parties causing that loss.'" Brodsky v. Grinnell Haulers, Inc., 181 N.J. 102, 114, 853 A.2d 940 (2004) (quoting Blazovic v. Andrich, 124 N.J. 90, 107, 590 A.2d 222 (1991). In that regard, the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 to -5.8, "mandates the apportionment of fault where `the question of liability is in dispute.'" Boryszewski, supra, 380 N.J.Super. at 375, 882 A.2d 410 (quoting N.J.S.A. 2A:15-5.2a). When more than one defendant is found negligent, the trier of fact determines the amount of damages suffered by the plaintiff and each party's percentage of negligence. N.J.S.A. 2A:15-5.2a. Based on *503 that percentage, the court molds the judgment, computing the amount of damages owed by each defendant. N.J.S.A. 2A:15-5.2d.
"The Joint Tortfeasors Contribution Law, N.J.S.A. 2A:53A-1 to -5, was enacted to promote the fair sharing of the burden of judgment by joint tortfeasors and to prevent a plaintiff from arbitrarily selecting his or her victim." Holloway v. State, 125 N.J. 386, 400-01, 593 A.2d 716 (1991). The Law was "also designed to `alleviate the evident harshness and inequity of the common-law rule . . . pursuant to which there was no right of joint tortfeasors to seek allocation among themselves of the burden of their fault.'" Burt v. W. Jersey Health Sys., 339 N.J.Super. 296, 303, 771 A.2d 683 (App.Div.2001) (quoting Markey v. Skog, 129 N.J.Super. 192, 199, 322 A.2d 513 (Law Div.1974)).
It is well established that a non-settling defendant has the right to have a settling defendant's liability apportioned by the jury. Brodsky, supra, 181 N.J. at 113, 853 A.2d 940; Young v. Latta, 123 N.J. 584, 591-96, 589 A.2d 1020 (1991). Settling defendants have no further liability to any party beyond that provided in the terms of the settlement. Thus, even if the non-settler has cross-claimed for contribution, that claim is dismissed as a matter of law, although the credit to the non-settling defendant survives. Young, supra, 123 N.J. at 591-96, 589 A.2d 1020; Tefft v. Tefft, 192 N.J.Super. 561, 570, 471 A.2d 790 (App.Div.1983). "If the proofs so justify, the jury may be asked to allocate fault between the settling and non-settling defendant, and the non-settling defendant will be responsible for only his allocated percentage of the verdict even if he did not assert a cross-claim for contribution and even if the total amount of the settlement and the non-settling defendant's percentage of the verdict is less than the full verdict." Pressler, supra, comment 2.2 on R. 4:7-5.
Here, on the day after Antonia settled with the football defendants for approximately $700,000, Antonia and Fazila moved for summary judgment seeking dismissal of all claims against the football defendants. However, by virtue of the settlement, all claims against them, including claims for contribution, had been dismissed as a matter of law. Young, supra, 123 N.J. at 591-96, 589 A.2d 1020. The question presented is whether plaintiffs may move for summary judgment on behalf of the settling football defendants, seeking elimination of the non-settling defendants' right to a credit.
Rule 4:46-1 provides in part that "[a] party seeking any affirmative relief may. . . move for summary judgment or order upon all or any part thereof or as to any defense." Arguably, plaintiffs met this requirement because a finding of liability against the settling football defendants would have reduced the verdict against the remaining non-settling defendants by the percentage of liability allocated to them, and thus plaintiffs clearly had an interest in having the settling defendants removed from jury consideration. See State v. Curry, 109 N.J. 1, 9, 532 A.2d 721 (1987) (New Jersey courts generally take a liberal view of standing). On the other hand, the procedure utilized by plaintiffs was not directed at the settling defendants, the ostensible targets of the summary judgment motions, but HSM and ASM and their right to apportion liability among all responsible parties. It was a patent attempt to strip HSM and ASM of their statutory right to allocation of fault among tortfeasors.
Plaintiffs seek to justify the motions by arguing that pursuit of cross-claims against the settling defendants would not have served defendants' defense strategy. *504 The simple response to this contention is that pursuit of cross-claims was a decision to be made by defendants, not plaintiffs.
Plaintiffs' motion for summary judgment against the settling defendants is also directly contrary to the recognized procedures for dismissal of claims by a party asserting a claim. While Rule 4:37-1(a) allows a voluntary dismissal of some or all claims against a party, the rules tacitly recognize the anomaly of a plaintiff arguing that there was no basis in law and/or in fact for the very claims it brought against one or several defendants. The procedure used by plaintiffs bespeaks a lack of true adversity that is an underpinning of our judicial system. See Caput Mortuum, L.L.C. v. S & S Crown Servs., Ltd., 366 N.J.Super. 323, 330, 841 A.2d 430 (App. Div.2004) (recognizing that New Jersey courts generally will not decide a case if there is no concrete adversity of interest between parties).
We appreciate plaintiffs' concerns about dissipation of a sizeable verdict through allocation of fault to settling defendants. Plaintiffs, however, are not without protection. The non-settling defendants must provide plaintiffs "with fair and timely notice" of the intent to pursue a credit, and must prove liability. Young, supra, 123 N.J. at 597, 589 A.2d 1020; Green v. Gen. Motors Corp., 310 N.J.Super. 507, 546, 709 A.2d 205 (App.Div.), certif. denied, 156 N.J. 381, 718 A.2d 1210 (1998).
Finally, in the context of the summary judgment motions against the settling defendants, we confront the bar of judicial estoppel. Just six months before accepting a settlement and then moving for summary judgment on their behalf, plaintiffs successfully opposed the football defendants' motion to dismiss. Furthermore, just the day before argument of the motion, counsel responded that it had a viable, albeit difficult, case against these same defendants. Plaintiffs are bound by these representations. McCurrie v. Town of Kearny, 174 N.J. 523, 533, 809 A.2d 789 (2002). Accordingly, the orders granting summary judgment in favor of the settling defendants are reversed.

B. The Non-Settling Defendants.

(1) The Gallery and Holder.
Plaintiffs also moved for summary judgment on behalf of The Gallery. Holder filed a motion for summary judgment, but it was argued by plaintiffs. We reach the same result as to these motions. Each bespeaks the same lack of adversity as the motions involving the settling defendants. The threat of collusion is also present in such a situation. While plaintiffs' decision not to pursue a punitive damage claim against Holder was probably ascribable to his impecunious state, the threat of collusion is enough to bar the tactic used in this case.
Moreover, the record demonstrates that as to The Gallery, there was a genuine issue of material fact regarding service, consumption and causation under principles of common law social host liability. As to Holder, it is clear that merely accompanying a drunk driver, or permitting him or her to drive, is not actionable in this State. Lombardo v. Hoag, 269 N.J.Super. 36, 53-54, 634 A.2d 550 (App. Div.1993), certif. denied, 135 N.J. 469, 640 A.2d 850 (1994). On the other hand, Holder purchased beer and champagne after the game and there is some evidence that Lanzaro drank some of that beer at The Gallery. Providing alcohol to an intoxicated person who intends to drive is actionable under common law negligence. Kelly v. Gwinnell, 96 N.J. 538, 548, 476 A.2d 1219 (1984). Therefore, the summary *505 judgments in favor of The Gallery and Holder are reversed.

(2) Sports Authority.
Finally, we address the summary judgment granted in favor of the Sports Authority. Unlike the remainder of the football defendants, the Sports Authority filed a motion for summary judgment that was granted. The motion was properly granted and this issue does not warrant extended discussion in this opinion. The Sports Authority is a public entity within the meaning of the Tort Claims Act, N.J.S.A. 59:1-1 to 12-3. Vanchieri v. N.J. Sports & Exposition Auth., 104 N.J. 80, 85, 514 A.2d 1323 (1986). As such, the Sports Authority is "not liable for failure to provide supervision of public recreational facilities. . . ." N.J.S.A. 59:2-7. Although an exception allows liability for failure to protect against a dangerous condition, ibid., this exception relates to the physical condition of the property not to activities that take place on it. Posey v. Bordentown Sewerage Auth., 171 N.J. 172, 188, 793 A.2d 607 (2002).

V.
Contrary to HMS's and ASM's representation, Ronald Verni did not move for summary judgment. Instead, HMS and ASM chose not to pursue their cross-claim against him as a result of the court's decision excluding any evidence that Antonia was secured in a seatbelt, not a child restraint system.[7] Because this case must be retried, we review the ruling for guidance in the next trial.
It is undisputed that Antonia had been secured in a seat belt in the rear seat, not in a child restraint seat.[8] Prior to trial, HMS and ASM submitted an expert's report, setting forth that Antonia had been secured by the lap belt, not the shoulder harness, and that her injuries were caused when the force of the impact thrust her head forward and downward, causing a tensile load on her neck and stretching her spinal cord; an injury that would not have occurred had she either been in a child seat or secured by a shoulder harness.
The court excluded any evidence regarding Antonia's failure to have been secured in a child restraint seat pursuant to N.J.S.A. 39:3-76.2a. The court also denied defendants' request to admit evidence regarding the misuse of a seat belt for purposes of comparative negligence or allocation, reasoning that such admission would "necessarily bring to the attention of the jury the failure to wear the child passenger restraint system directly contravening the admonition in the statute that . . . it is not admissible as evidence in the trial of any civil action."
On appeal, defendants argue "[p]ublic policy and fundamental fairness dictated that the jury should have been allowed to consider Mr. Verni's fault based on evidence that he drove the car with Antonia unsafely restrained in an adult lap belt, which act substantially increased the extent and severity of her injuries." They further argue that although Antonia's "damages may not be reduced" under the law, the court "must still allow the jury to allocate another culpable party's comparative fault."
N.J.S.A. 39:3-76.2a[9], in effect at the time of the accident provided that:

*506 Every person operating a motor vehicle equipped with safety belts who is transporting a child under the age of 5 years on roadways, streets or highways of this State, shall be responsible for the protection of the child by properly using a child passenger restraint system that complies with the federal motor vehicle safety standard applicable when it was manufactured, or where the child is 18 months of age or more but under 5 years of age by securing the child with a safety belt in a rear seat. If there are no rear seats, a child restraint system must be used. In no event shall failure to wear a child passenger restraint system be considered as contributory negligence, nor shall the failure to wear the child passenger restraint system be admissible as evidence in the trial of any civil action. (emphasis added.)
The plain language of the statute at the time of the accident allowed a child to be secured in a rear seat with a seat belt, and further provided that the failure to wear the child passenger restraint system was not "admissible as evidence in the trial of any civil action." N.J.S.A. 39:3-76.2a. In that regard the failure to use the child restraint system was not admissible on any issue, including comparative negligence and allocation. See Bary v. Mack Trucks, Inc., 261 N.J.Super. 35, 40, 617 A.2d 681 (Law Div.1992) (under a similar Pennsylvania law, the failure to use a set belt was not admissible).
Nonetheless, defendants argue they should have been able to present evidence that Ronald Verni "unsafely" secured Antonia in an adult seat belt. However, as the trial court found, allowing evidence that Antonia was secured by a seat belt would bring to the attention of the jury the child's failure to have been secured in a child restraint system. Although no reported New Jersey case has addressed this issue, and the legislative history provides no insight, several out-of-state cases have interpreted similar statutes. For example, in Brager v. Fee, 750 F.Supp. 364, 366-67 (C.D.Ill.1990), the court, in addressing an almost identical Illinois statute, dismissed the defendant's counterclaim based on the plaintiff's failure to "properly secure" his four-year-old son in the vehicle. In Florida Power & Light Co. v. Macias, 507 So.2d 1113, 1116 (Fla. Dist.Ct.App.1987), the court held that the parents' negligence in failing to secure their child in the vehicle could not be imputed to the child to diminish recovery or limit a third party's liability.
Moreover, courts in states with similar statutes have also precluded evidence of the misuse of a child safety seat or seatbelt to establish comparative negligence, reasoning that such evidence was indistinguishable from the evidence of failure to use such restraints. See Watkins v. Hartsock, 245 Kan. 756, 783 P.2d 1293, 1299 (1989) (misuse of child safety belt was not admissible to show that parent was comparatively negligent); Chaney v. Young, 122 N.C.App. 260, 468 S.E.2d 837, 839 (1996) (misuse is tantamount to non-use).
We note that this statutory bar is entirely consistent with the common law in this State concerning parental liability for injuries suffered by or inflicted on their children. In Foldi v. Jeffries, 93 N.J. 533, 461 *507 A.2d 1145 (1983), the Court held that a minor child could not recover for personal injuries arising from an accident attributable to her mother's negligent supervision. Id. at 546, 461 A.2d 1145. The Court observed that the doctrine of parental immunity should be retained "in the areas involving the exercise of parental authority or the provision of customary child care." Ibid. On the other hand, the Court allowed recovery by a minor child and third parties in instances of intentional torts and willful and wanton supervisory conduct. Id. at 548, 461 A.2d 1145.
This rule was reaffirmed in Buono v. Scalia, 179 N.J. 131, 843 A.2d 1120 (2004). There, a father allowed his five-year old child to ride his bike on a closed street during a neighborhood block party. Id. at 134, 843 A.2d 1120. The child struck a younger child with his bike and both children fell to the ground. Id. at 135, 843 A.2d 1120. The complaint for negligent supervision against the father of the five-year old was dismissed because the father's conduct could not be considered willful or wanton. Ibid. The Court noted that the parental decision "falls within the purview of parental philosophy involving a child's upbringing. . . ." Id. at 141, 843 A.2d 1120.
Here, Antonia had become ill and soiled her car seat. Her parents removed her from the seat and decided to secure her in a lap belt in the rear of the car. Her mother also sat next to her to assist her. This is the type of ordinary child care decision a parent must make every day. The trial judge correctly barred reference to the failure of the child to be properly restrained.

VI
Defendants also cite various errors regarding the punitive damage award. They contend that the evidence fails to support a punitive damage award in this case; the punitive damage award contravenes N.J.S.A. 2A:15-5.13(e); the attempted reconstruction of the record of the punitive damage charge is inadequate and defective, vicarious liability of the principal did not satisfy the elements of section 909 of the Restatement (Second) of Torts (1977); the punitive damage award contravenes federal constitutional limitations applicable to punitive damage awards, the defendants received inadequate notice of the potential severity of the award; and on de novo review, this court should substantially reduce the award. Due to our disposition of the appeal, we need not reach any of these issues.
Defendants also argue that the Beverage Server Act bars punitive damages. This issue was not raised at trial. We decline to address the issue in this appeal. Whether the Beverage Server Act bars punitive damages appears to be an issue of first impression. We conclude that the issue is anticipatory, and perhaps remote, dependant as it is on the record adduced at the new trial. We conclude that the parties would be better served if the issue was addressed in the context of the further proceedings required by this opinion.
In summary, we hold that the trial judge erred in delaying his ruling on the agency status of ASM and that delay allowed the admission of evidence that is barred in a dram shop claim governed by the Beverage Server Act. The error was compounded by the absence of a limiting instruction and an instruction to the jury that the inadmissible evidence could be considered as evidence of habit of the service of alcohol at Giants Stadium. We also hold that the trial judge erred by granting plaintiffs' motions to add AC and ASEG as parties at the close of the trial. In addition, the loss-of-enjoyment damages instruction erroneously advised the jury that it could consider *508 and provide compensation for Antonia's shortened life expectancy.
We also hold that the orders granting summary judgment to the NFL, Tagliabue, Holder and The Gallery wrongfully deprived defendants from seeking allocation of negligence among those parties by the jury. We also hold that the Sports Authority's motion for summary judgment was properly granted and the trial judge properly barred evidence that Ronald Verni had not properly secured his daughter in an appropriate child restraint system.
Reversed and remanded for a new trial.
NOTES
[1] The Giants and Jets professional football teams use Giants Stadium. Each season, sixteen home games are played at Giants Stadium.
[2] In December 1980, the Authority consigned the sale of food and beverages within the stadium to HMS, the liquor license holder. In 1995 Aramark Corporation acquired HMS as a subsidiary, but HMS retained its separate corporate status and continued to operate the stadium concessions, albeit under the Aramark trademark brand. HMS did not, however, retain its employees; it "leased" employees from ASM, a union shop and another Aramark Corporation subsidiary, which had been established as a staffing corporation. More than ninety beer servers worked at the stadium during home games.
[3] Plaintiffs also suggest that defendants admitted some evidence of service policy, supervision and disciplinary history during the defense case. As noted, the agency ruling was not made until the third day of the defense case. The delay left the defendants with little choice but to respond to plaintiffs' proofs.
[4] Sutherland testified during the punitive damages trial, not during the main trial, and thus this testimony could not have played a part in the court's initial decision.
[5] At various points in the damages charge, the trial judge instructed the jury that it should use the same instructions for the mother's claim and vice versa. Therefore, there is the possibility that the jury applied the same charge to its consideration of Fazila's damages.
[6] HMS's counsel was present during the hearing.
[7] The court barred, for failure to submit a timely report, HMS's and ASM's expert from testifying that Fazila's failure to wear a seat belt contributed to her damages.
[8] Antonia had vomited in her car seat earlier that day and Fazila had removed the child from the car seat.
[9] In 2001 the statute was amended to provide that children "under the age of eight years and weighing less than 80 pounds" must be secured in "a child passenger restraint system or booster seat. . . ." N.J.S.A. 39:3-76.2a. The remainder of the statute remained essentially unchanged, providing that "[i]n no event shall failure to wear a child passenger restraint system or to use a booster seat be considered as contributory negligence, nor shall the failure to wear the child passenger restraint system be admissible as evidence in the trial of any civil action." N.J.S.A. 39:3-76.2a.