801 A.2d 407 (2002)
353 N.J. Super. 48
OTR ASSOCIATES, Plaintiff-Respondent,
v.
IBC SERVICES, INC. a/k/a International Blimpie Corporation, a/k/a Blimpie International, Inc. and Garden State Blimpie, INC., Defendants-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued May 7, 2002.
Decided July 3, 2002.
*408 David Scott Lafferty, Hackensack, argued the cause for appellants (Lafferty, Suh & Herlinsky, attorneys; John F. Verhey and Julie Garvey Davis of the Chicago firm of Seidler & McErlean, of counsel; Mr. Lafferty, on the brief).
Lawrence H. Wertheim, Woodbridge, argued the cause for respondent (Greenbaum, Rowe, Smith, Ravin, Davis & Himmel, attorneys; Mr. Wertheim, of counsel and on the brief).
Before Judges PRESSLER, CIANCIA and FUENTES.
The opinion of the court was delivered by PRESSLER, P.J.A.D.
The single dispositive issue raised by this appeal is whether the trial court, based on its findings of fact following a bench trial, was justified, as a matter of law, in piercing the corporate veil and thus holding a parent corporation liable for the debt incurred by its wholly owned subsidiary. We are satisfied that the facts, both undisputed and as found, present a textbook illustration of circumstances mandating corporate-veil piercing.
Plaintiff OTR Associates, a limited partnership, owns a shopping mall in Edison, New Jersey, in which it leased space in 1985 for use by a Blimpie franchisee, Samyrna, Inc., a corporation owned by Sam Iskander and his wife. The franchise agreement, styled as a licensing agreement, had been entered into in 1984 between Samyrna and the parent company, then known as International Blimpie Corporation, whose name was changed in 1985 to Astor Restaurant Group, Inc., and again in 1991 or 1992 to Blimpie International, Inc. Thus the three names denote the *409 same corporation at different stages of its existence, and we refer to it hereafter as Blimpie. Blimpie was the sole owner of a subsidiary named IBC Services, Inc. (IBC), created for the single purpose of holding the lease on premises occupied by a Blimpie franchisee. Accordingly, it was IBC that entered into the lease with OTR in July 1985 and, on the same day and apparently with OTR's consent, subleased the space to the franchisee. The history of the tenancy was marked by regular and increasingly substantial rent arrearages, and it was terminated by a dispossess judgment and warrant for removal in 1996. In 1998 OTR commenced this action for unpaid rent, then in the amount of close to $150,000, against Blimpie under both its present name and its former name, International Blimpie Corporation. It also joined as defendants the leasing subsidiary, IBC, as well as Garden State Blimpie, Inc., another wholly-owned leaseholding subsidiary of Blimpie to whom IBC had assigned the lease in 1991 without notice to the landlord in violation of the terms of the lease requiring such notice.[1] The action was tried in December 2000, and judgment was entered in favor of OTR against Blimpie as well as the two judgment-proof subsidiaries in the full amount of the rent arrearages plus interest thereon, then some $208,000. Blimpie appeals, and we affirm.
We consider the facts in the context of the well-settled principles respecting corporate-veil piercing. Nearly three-quarters of a century ago, the Court of Errors and Appeals, in Ross v. Pennsylvania R.R. Co., 106 N.J.L. 536, 538, 539, 148 A. 741 (E.& A.1930), made clear that while "ownership alone of capital stock in one corporation by another, does not create any relationship that by reason of which the stockholding company would be liable for torts of the other," nevertheless "[w]here a corporation holds stock of another, not for the purpose of participating in the affairs of the other corporation, in the normal and usual manner, but for the purpose of control, so that the subsidiary company may be used as a mere agency or instrumentality for the stockholding company, such company will be liable for injuries due to the negligence of the subsidiary." The conceptual basis of the rule enunciated by Ross, which is equally applicable to contractual obligations, is simply that "[i]t is where the corporate form is used as a shield behind which injustice is sought to be done by those who have control of it that equity penetrates the [corporate] veil." Irving Inv. Corp. v. Gordon, 3 N.J. 217, 223, 69 A.2d 725 (1949). And, as the Supreme Court phrased it in State, Dep't. of Envtl. Prot. v. Ventron Corp., 94 N.J. 473, 500, 468 A.2d 150 (1983), "[t]he purpose of the doctrine of piercing the corporate veil is to prevent an independent corporation from being used to defeat the ends of justice, ... to perpetrate fraud, to accomplish a crime, or otherwise to evade the law." See also Tung v. Briant Park Homes, Inc., 287 N.J.Super. 232, 239-240, 670 A.2d 1092 (App.Div.1996).
Thus, the basic finding that must be made to enable the court to pierce the corporate veil is "that the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent." Ventron, supra, 94 N.J. at 501, 468 A.2d 150. But beyond domination, the court must also find that the "parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law." Ibid. And the hallmarks of that abuse are typically the engagement *410 of the subsidiary in no independent business of its own but exclusively the performance of a service for the parent and, even more importantly, the undercapitalization of the subsidiary rendering it judgment-proof. Ibid.
Finally, we point out that these principles are hardly novel to New Jersey, constituting rather a fundamental doctrine of corporate jurisprudence. See, e.g., cases collected in J.A. Bryant, Annotation, Liability of Corporations for Contracts of Subsidiaries, 38 A.L.R.3d 1102 (1971), and Supplementary Case Service. See also Adolf A. Berle, Jr., The Theory of Enterprise Entity, 47 Colum. L.Rev. 343 (1947); Note, Piercing the Corporate Law Veil: The Alter Ego Doctrine Under Federal Common law, 95 Harv. L.Rev. 853 (1982). And see Restatement (Second) of Agency § 14M appendix, Reporter's Notes (1984).
Blimpie concedes that it formed IBC for the sole purpose of holding the lease on the premises of a Blimpie franchisee.[2] It is also clear that IBC had virtually no assets other than the lease itself, which, in the circumstances, was not an asset at all but only a liability since IBC had no independent right to alienate its interest therein but was subject to Blimpie's exclusive control. It had no business premises of its own, sharing the New York address of Blimpie. It had no income other than the rent payments by the franchisee, which appear to have been made directly to OTR. It does not appear that it had its own employees or office staff. We further note that Blimpie not only retained the right to approve the premises to be occupied by the franchisee and leased by IBC, but itself, in its Georgia headquarters, managed all the leases held by its subsidiaries on franchisee premises. As explained by Charles G. Leaness, presently Executive Vice President of Blimpie and formerly corporate counsel as well as vice-president and secretary of IBC, in 1996, the year of IBC's eviction for non-payment of rent, he was Blimpie's Corporate Counsel Compliance Officer. Blimpie, he testified, is exclusively a franchising corporation with "hundreds and hundreds" of leases held by its wholly-owned leasehold companies, which are, however, overseen by Blimpie's administrative assistants, that is "people in our organization that ... do this [communicate with landlords] as their everyday job. Because we haveyou knowthere are various leases, various assignments." Leaness also made clear that the leasing companies, whose function he explained as assisting franchisees in negotiating leases, "don't make a profit. There's no profit made in a leasehold."
Domination and control by Blimpie of IBC is patent and was not, nor could have been, reasonably disputed. The question then is whether Blimpie abused the privilege of incorporation by using IBC to commit a fraud or injustice or other improper purpose. We agree with the trial judge that the evidence overwhelmingly requires an affirmative answer. The leit motif of the testimony of plaintiff's partners who were involved in the dealings with IBC was that they believed that they were dealing with Blimpie, the national and financially responsible franchising company, and never discovered the fact of separate corporate entities until after the eviction. While it is true that IBC never apparently expressly claimed to be Blimpie, it not only failed to explain its relationship to Blimpie as a purported independent company but it affirmatively, intentionally, and calculatedly led OTR to believe it was Blimpie. Illustratively, when OTR was pre-leasing *411 space in the mall, the first approach to it was the appearance at its on-site office of two men in Blimpie uniforms who announced that they wanted to open a Blimpie sandwich shop. One of the men was the franchisee, Iskander. The other was never identified but presumably was someone with a connection to Blimpie. It is also true that the named tenant in the lease was IBC Services, Inc., but the tenant was actually identified in the first paragraph of the lease as "IBC Services, Inc. having an address at c/o International Blimpie Corporation, 1414 Avenue of the Americas, New York, New York." It hardly required a cryptographer to draw the entirely reasonable inference that IBC stood for International Blimpie Corporation, Blimpie's corporate name when the lease was executed. The suggestion, unmistakably, was that IBC was either the corporate name or a trading-as name and that International Blimpie Corporation was the other of these two possibilities.
Beyond the circumstances surrounding the commencement of the tenancy relationship, the correspondence through the years between plaintiff and the entity it believed to be its tenant confirmed plaintiff's belief that Blimpie was its tenant. Blimpie's letters to OTR were on stationary headed only by the Blimpie logo. There is nothing in any of that correspondence that would have suggested the existence of an independent company standing between the franchisor and the franchisee, and, indeed, the correspondence received by OTR from its lessee typically referred to the sub-tenant, Samyrna, as "our franchisee."
We agree with the trial judge that the inference is ineluctable and virtually conceded by Blimpie that IBC was created as a judgment-proof corporation for the sole purpose of insulating Blimpie from any liability on the lease in the event of the franchisee's default, a purpose found by the trial judge to have been deliberately concealed by Blimpie by its conduct in creating the impression from the outset of the tenancy relationship and throughout its duration that it and IBC were one and the same. We reject Blimpie's contention of the irrelevancy of its conduct after execution of the lease that tended to confirm to plaintiff that it was the actual tenant. As we have noted, the franchisee was habitually late and in arrears in its rent payments. We think it clear that if OTR had any suspicion that its tenant was a judgment-proof corporation, it would not have forborne over the years as the arrearages continued to accumulate but would have taken steps to regain possession long before the tenant's obligations reached $150,000.[3]
As we understand Blimpie's defense and its argument on this appeal, it asserts that it is entitled to the benefit of the separate corporate identities merely because IBC observed all the corporate proprietiesit had its own officers and directors *412 albeit interlocking with Blimpie's, it filed annual reports, kept minutes, held meetings, and had a bank account. But that argument begs the question. The separate corporate shell created by Blimpie to avoid liability may have been mechanistically impeccable, but in every functional and operational sense, the subsidiary had no separate identity. It was moreover not intended to shield the parent from responsibility for its subsidiary's obligations but rather to shield the parent from its own obligations. And that is an evasion and an improper purpose, fraudulently conceived and executed. The corporate veil was properly pierced.
We note that the creation of a judgment-proof wholly-owned subsidiary as the leaseholding entity for a solvent retail chain is not a novel device. Nor is it a successful one. A similar technique came under the court's scrutiny in Weisser v. Mursam Shoe Corporation, 127 F. 2d 344 (2d Cir.1942). That case involved the chain of Miles Shoe Stores owned by Murray M. Rosenberg, Incorporated, whose principles were Murray and Samuel Rosenberg. The corporation formed a judgment-proof shell corporation called Mursam Shoe Corporationagain no cryptographer neededto lease premises for the operation of a Miles Shoe Store. In reversing a summary judgment entered in the parent's favor, the court, by Judge Frank, held that the landlord would be entitled to recover against it on proof that "Mursam was only a tool of the other defendants, deliberately kept judgment-proof, to obtain the benefits of the lease with the plaintiffs without assuming any obligations." Id. at 346. Moreover, since the leased premises were located in New Jersey and the lease made and recorded in this State, the court expressly applied New Jersey law, relying on Ross v. Pennsylvania R.R. Co., supra, 106 N.J.L. 536, 148 A. 741. The only difference between Mursam and this case is that there the landlord asserted that Mursam had expressly represented that it was the parent. While there was no such direct representation here, we are satisfied, based on the record and the trial judge's findings, that there clearly was such an implicit representation in Blimpie's conduct, which reasonably induced plaintiff to believe it and IBC were the same. Thus the metaphor of puppeteer and the marionette used by the court to describe the parent and subsidiary in Weisser, 127 F.2d at 349, applies with equal pertinence here.
The judgment appealed from is affirmed.
NOTES
[1] No corporate officer of Blimpie was able to explain the reason for the assignment by IBC to Garden State Blimpie. It is, however, clear that Garden State Blimpie was the same type of judgment-proof instrumentality of Blimpie as was IBC.
[2] It was unclear from the evidence whether IBC held only the OTR lease or other Blimpie leases in New Jersey as well. According to the record there were 55 Blimpie franchises in New Jersey, and plaintiff's demand for production of the leases was not honored.
[3] According to the record, in 1997 plaintiff relet the recaptured premises to another Blimpie franchisee. The franchisor, however, was not this defendant, Blimpie International, but an entirely separate entity called Blimpie Associates. Blimpie Associates was created when the original partners of the first Blimpie organization separated and defined the exclusive territory in which each would operate. Although Edison is not in the territory of Blimpie Associates, it was Blimpie Associates which had the prospective franchisee, and the two parent Blimpie entities reached an accommodation permitting Blimpie Associates to franchise a location in Edison by a swap of locations with Blimpie International. What is significant about the reletting, however, is that the lease for the second Blimpie franchisee, made with a wholly-owned subsidiary of Blimpie Associates, expressly disclosed that the subsidiary/lessee was "thinly capitalized" and a separate entity. Thus, as plaintiff's managing partner testified, he was able to evaluate the risk he was taking, able to negotiate a partial personal guarantee of the lease by the principal of the franchisee and was prepared to respond appropriately should the occasion of default arise. The second Blimpie franchisee, however, has been regular in his rent payments.