

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-10-2009

# Pharmacia Corp v. Motor Carrier Serv

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-3204

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Pharmacia Corp v. Motor Carrier Serv" (2009). *2009 Decisions.* Paper 1891.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1891

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

_____

No. 07-3204

_____

PHARMACIA CORPORATION f/k/a MONSANTO COMPANY

v.

MOTOR CARRIER SERVICES CORP.; CSX INTERMODAL, INC.;
CSX CORPORATION; G.O.D., INC.; RILEY LEASING CORP.

Motor Carrier Services Corp.; CSX Intermodal, Inc.;
CSX Corporation,
Appellants

_____

No. 08-2553

_____

PHARMACIA CORPORATION,
f/k/a Monsanto Company,

v.

MOTOR CARRIER SERVICES CORP.;
CSX INTERMODAL, INC.;
CSX CORPORATION;
G.O.D., INC.;
RILEY LEASING CORP.,

Motor Carrier Services Corp.; CSX Intermodal, Inc.; CSX Corporation,
Appellants

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 04-cv-03724)
District Judge: Honorable Garrett E. Brown, Jr.

Argued January 12, 2009

Before: SLOVITER and BARRY, <u>Circuit</u> <u>Judges</u>, and
POLLAK[*], <u>District</u> <u>Judge</u>

(Filed: February 10, 2009)

_____

Roy T. Englert, Jr.    (Argued)
Robbins, Russell, Englert, Orseck & Untereiner
Washington, D.C.  20006

     Attorney for Appellants

John McGahren    (Argued)
Patton Boggs
Newark, N.J.  07102

     Attorney for Appellee

_____

OPINION

_____

SLOVITER, <u>Circuit Judge</u>.

**I.**

Pharmacia Corp. (formerly known as the Monsanto Company) manufactured

chemicals at a facility on 28 acres of property abutting the Passaic River in Kearny, New

Jersey (the "Kearny Site"), from 1956 to 1991.  In December 1994, it sold the Kearny Site

[*] Hon. Louis H. Pollak, Senior Judge, United States District Court for the Eastern District of Pennsylvania, sitting by designation.

to Motor Carrier Services Corp., which owned a six-acre property located across the street, for approximately $5.5 million.

The purchase and sale agreement (the "Agreement") between the parties expressly addressed the division of responsibility between Pharmacia and Motor Carrier regarding environmental cleanup activities at the Kearny Site. Pharmacia was obligated to complete (as it did) certain remedial actions required by the New Jersey Department of Environmental Protection ("NJDEP") under a 1989 settlement as well as certain future activities related thereto. Under § 2.3 of the Agreement, Motor Carrier is responsible for

> (i) any and all costs and expenses (including attorney's fees) of Clean-up [required under federal or state law] . . . (ii) and any voluntarily incurred costs and expenses (including attorney's fees) to investigate, remediate, remove, treat, clean up or prevent the escape, in each case of any Substances present at or which migrate from the Kearny Site, the Plant or the Property at any time after the Effective Time.

App. at 2426.

The Agreement also provides that the party receiving notice or obtaining information that a proceeding regarding an environmental cleanup may be commenced against or by one of the parties "shall promptly provide written notice thereof to the other party." App. at 2451.

In January 1998, CSX Intermodal, Inc. ("Intermodal") acquired all the shares of Motor Carrier for approximately $14.5 million. Intermodal is a wholly-owned subsidiary of CSX Corp. ("CSX"). Prior to closing, Pharmacia requested assurance that Motor Carrier's net worth was at least $5 million. Intermodal responded by informing

3

Pharmacia that it had purchased Motor Carrier and recognized that it was an "Affiliate" under the Agreement. As a result of the stock purchase transaction, Motor Carrier became a wholly-owned subsidiary of Intermodal.

In January 1995 (shortly after Pharmacia's sale of the Kearny Site to Motor Carrier), the United States Environmental Protection Agency ("EPA") informed Pharmacia that it was investigating environmental contamination in a six-mile stretch of the Passaic River near Newark, New Jersey. By letter dated April 1996, EPA notified Pharmacia of its potential liability under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). Pharmacia responded by informing EPA that it would not participate in the remediation of the Passaic River "[b]ecause there was inadequate evidence tying the [Kearny] site to issues in the river." App. at 534.

In September 2003, EPA again contacted Pharmacia by letter regarding its potential liability under CERCLA for the Kearny Site. Later in September 2003, NJDEP issued an administrative directive that informed Pharmacia and Motor Carrier that they were potentially liable under state law for contamination of the Passaic River from the Kearny Site. In March 2004, EPA issued a final draft Administrative Order on Consent, under which the settling parties–which did not include Pharmacia until June 2005–agreed to reimburse EPA for certain costs associated with EPA's Remedial Investigation and Feasibility Study ("RI/FS") of the lower Passaic River. All the settling parties agreed to jointly fund $10 million of EPA's costs for the lower Passaic River RI/FS. In March 2004, Pharmacia's counsel then provided Motor Carrier with notice of an environmental

4

claim based on EPA's action. Motor Carrier refused Pharmacia's request that it indemnify it for the costs of the EPA or NJDEP actions. Pharmacia filed this action in August 2004.

## II.

Pharmacia sought summary judgment to pierce Motor Carrier's corporate veil, which the District Court granted in December 2006. As a result, it held Intermodal liable for Motor Carrier's liability under the Agreement. Following a bench trial, the District Court entered an order on June 22, 2007, holding that Motor Carrier, Intermodal, and CSX were required to indemnify Pharmacia under the Agreement "for any and all costs for which Pharmacia is or becomes liable to NJDEP and USEPA . . . or any future action by NJDEP, USEPA or any other regulatory agency related to the remediation of the Lower Passaic River, and for future cleanup of the Kearny Site." App. at 103. The District Court also rejected Motor Carrier's late notice defense as to the costs of the EPA investigation.

In August 2007, the National Oceanic and Atmospheric Administration ("NOAA"), acting as the lead federal natural resources trustee under CERCLA, informed Pharmacia that it was potentially liable for natural resource damages to the lower Passaic River based on its former Kearny Site operations. Pharmacia notified Motor Carrier of the NOAA claim and sought indemnification under the Agreement and the District Court's June 22 order, but Motor Carrier refused.

On September 17, 2007, the District Court ordered Motor Carrier to pay Pharmacia

5

approximately $448,430 in cleanup costs incurred up to that date.  On January 9, 2008,

the District Court ordered Motor Carrier to pay approximately $469,360 in attorneys' fees

to Pharmacia, which represented the cost of Pharmacia's legal representation in the

underlying government investigations.  The District Court entered final judgment on May

19, 2008.[1]

### III.

This is essentially a contract dispute.  Because we conclude that the Agreement is

not ambiguous, we review the District Court's interpretation de novo.  Motor Carrier

argues that it is responsible for the costs of cleanup activities only if the pollutants at issue

---

[1] The District Court had jurisdiction over Pharmacia's state law contract claims under 28 U.S.C. § 1332.  Motor Carrier filed two appeals in this case, which we have consolidated. On July 20, 2007, Motor Carrier filed a notice of appeal as to the District Court's June 22, 2007 order resolving liability issues (No. 07-3204), and that appeal subsequently ripened when the District Court fully resolved the parties' claims on the merits.  See Cape May Greene, Inc. v. Warren, 698 F.2d 179, 184-85 (3d Cir. 1983). We have jurisdiction over No. 07-3204 pursuant to 28 U.S.C. § 1291.

Pharmacia argues the second notice of appeal (No. 08-2553), which stated it appealed the May 19, 2008 judgment, was untimely.  It contends that the District Court's January 9, 2008 order was the relevant final judgment. The District Court's order entered on May 19, 2008 was entitled "Final Judgment," App. at 27A, and we see no reason not to take that designation at face value.  We conclude that Motor Carrier's notice of appeal in No. 08-2553 was timely filed and that we therefore also have jurisdiction over that appeal pursuant to 28 U.S.C. § 1291.

6

migrated from the Kearny Site after the Agreement became effective (a condition it claims is not satisfied). It contends that § 2.3 (quoted earlier) makes it responsible only for government-ordered cleanup under § 2.3(i) and voluntary activities under § 2.3(ii), but "in each case" only for "Substances . . . which migrate from the Kearny Site . . . at any time after the Effective Time." App. at 2426. We reject that contention and instead agree with the District Court that under § 2.3(i) Motor Carrier must pay the cost of "Clean-up," which is defined in the Agreement to mean "investigatory, remedial and monitoring work mandated by the Requirements of Law or a Governmental Agency to investigate, remediate, remove, treat, clean-up, contain or prevent the escape of Substances on, within, generated by or emitted from [the Kearny Site]." App. at 2420. Nothing in that definition suggests a temporal limitation on Motor Carrier's liability for government-mandated cleanup. Thus, it follows that the "after the Effective Time" language in § 2.3 relied upon by Motor Carrier modifies only § 2.3(ii)–which, again, does not use the defined term "Clean-up"–and not § 2.3(i).[2]

Interpreting § 2.3 to impose responsibility on Motor Carrier for government-mandated cleanup activities is consistent with the remaining provisions in the Agreement.

---

[2] Motor Carrier also contends that the District Court's interpretation renders the phrase "in each case" in § 2.3 meaningless. We disagree. The phrase "in each case" refers to the types of voluntary cleanup activities that immediately precede it in § 2.3(ii) and does not refer back to government-mandated "Clean-up" covered by § 2.3(i).

7

Section 2.5 governs Motor Carrier's indemnification obligation for cleanup activities. As relevant here, § 2.5(a) requires Motor Carrier to indemnify Pharmacia for "any Fine assessed from and after the Effective Time," whereas § 2.5(b) requires Motor Carrier to indemnify Pharmacia for "any costs of Clean-up of Substances" required under federal or state law "whether or not such Clean-up arises from or in connection with Substances dumped, buried, injected, deposited or disposed of by [Pharmacia]." App. at 2429. This broad language of § 2.5(b) clearly requires Motor Carrier to indemnify Pharmacia for government-mandated cleanup costs that "arise from" environmental harms caused by Pharmacia's former operations and includes no limitation based on when the pollutants at issue migrated from the Kearny Site. Similarly, §§ 2.2 and 2.4, which govern Pharmacia's obligations for cleanup, clearly limit Pharmacia's cleanup obligations to certain activities previously mandated by NJDEP.

Motor Carrier next contends that even if it must indemnify Pharmacia for costs associated with the EPA and NJDEP investigations, the District Court erred in holding it responsible for the costs of the NOAA investigation because NOAA seeks "compensatory damages for natural resource injury" as well as "costs of assessing injury to natural resources," neither of which is covered by the term "Clean-up" under the Agreement. Appellant's Supp. Br. at 13 (emphasis omitted). However, the NOAA action falls squarely within the broad definition of "Clean-up." The "primary purpose" of EPA-mandated cleanups under CERCLA "is to protect human health." See Natural Resource

8

Damage Assessments, 51 Fed. Reg. 27,674, 27,681 (Aug. 1, 1986). In contrast, natural resource damage assessments involve, inter alia, remedial efforts, "such as habitat management or acquisition of an equivalent resource, [that] will be beyond the scope of the [EPA] response action." Id.; see also 43 C.F.R. § 11.93(a) (requiring completion of "Restoration Plan" that "shall describe how the monies [obtained by natural resources trustees] will be used to address natural resources, specifically what restoration, rehabilitation, replacement, or acquisition of the equivalent resources will occur.").

In sum, the NOAA action falls squarely within the definition of "Clean-up" under the Agreement. The "assessment" for which NOAA sought funding in August 2007 is an "investigation" of the extent of natural resource damage caused by Pharmacia and the other potentially liable parties to the Passaic River. Moreover, any damages required to be paid following the assessment will be used for "remedial" activities, such as "restoration" or "rehabilitation" of the Passaic River.

**IV.**

Motor Carrier next challenges the District Court's finding that Pharmacia provided the notice required by the Agreement of the EPA investigation and that in any case Motor Carrier proved no prejudice, as required by Pfizer, Inc. v. Employers Ins. of Wausau, 712 A.2d 634, 644 (N.J. 1998), and Cooper v. Gov't Employees Ins. Co., 237 A.2d 870, 873-

9

74 (N.J. 1968).[3] We need not decide whether Pharmacia provided Motor Carrier with sufficient notice of EPA's April 1996 letter informing Pharmacia of its potential CERCLA liability for the Kearny Site, because we conclude that the District Court did not clearly err in finding that Motor Carrier was not prejudiced by any such late notice.

The District Court found that Motor Carrier failed to offer evidence that Pharmacia made any decisions in defense of the EPA investigation that were detrimental to Motor Carrier. Motor Carrier counters that if Pharmacia had properly provided notice of the April 1996 letter, it could have exercised its right under § 9.9 of the Agreement to take over the defense of the EPA action. It also argues that Pharmacia failed to present a report by its environmental consultant (Roux Associates) that suggested that Pharmacia's operations at the Kearny Site could not have contaminated the Passaic River. However, as Pharmacia notes, it had provided EPA with a similar report from Roux Associates even before EPA's April 1996 letter. More importantly, there is no indication that Motor

---

[3] The New Jersey decision on which Motor Carrier relies, Sneed v. Concord Ins. Co., 237 A.2d 289 (N.J. Super. Ct. App. Div. 1967), did not create an exception to the general rule that an insurer must show prejudice to succeed on a late notice defense, but rather dealt with the distinct issue of estoppel where an insurer seeks to deny coverage after controlling the defense of the underlying claim for a substantial period after the insurer became aware of the basis for denying coverage. See also Vornado, Inc. v. Liberty Mut. Ins. Co., 254 A.2d 325 (N.J. Super. Ct. Ch. Div. 1969) (noting distinction between estoppel cases and late notice defense, and holding that insurer asserting late notice defense must prove prejudice).

10

Carrier "irretrievably lost" any rights or could have been more successful in defending EPA's investigation. EPA took no action against Pharmacia until September 2003, when it sent Pharmacia another letter regarding its potential CERCLA liability. Pharmacia formally notified Motor Carrier of EPA's issuance of a draft administrative order regarding the lower Passaic River in March 2004. Pharmacia did not enter into a settlement with EPA until June 2005. Thus, Motor Carrier could have exercised its right to take over the defense of the EPA investigation more than a year before any liability was imposed on Pharmacia. Because we cannot conclude that the District Court's finding of no prejudice was clearly erroneous, Motor Carrier was not entitled to a late notice defense.

## V.

We turn to Motor Carrier's contention that the District Court erred in granting summary judgment to pierce its corporate veil, thereby holding Intermodal liable for Motor Carrier's indemnification obligations. We review the grant of summary judgment de novo. Under New Jersey law, the corporate veil of a subsidiary corporation may be pierced only where (1) "the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent" and (2) "the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law." New Jersey Dep't of Envtl. Prot. v. Ventron Corp., 468 A.2d 150, 164 (N.J. 1983).

11

The District Court summarized the relevant facts as to the first prong as follows: "Since the closing, in January 1998, neither the shareholders, officers nor directors of Motor Carrier have held a meeting as set forth in the company's by-laws. Moreover, Motor Carrier has not . . . maintained a balance sheet, nor issued a financial report to Intermodal." App. at 69. Motor Carrier also "has no employees, and exists solely as a holding company for the Kearny [Site]," App. at 60, and Intermodal uses that property without a lease or payment. The totality of these circumstances suggests that the District Court correctly concluded that Intermodal dominated Motor Carrier.

Motor Carrier argues that the District Court improperly concluded that it was undercapitalized. However, undercapitalization is merely one factor to be considered, and is not a requirement for piercing the corporate veil. Although Motor Carrier correctly notes that courts usually analyze capitalization at the inception of a corporation, that rule does not apply when "the corporation distinctly changes the nature or magnitude of its business." 1 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 41.33 (2008). Here, the nature of Motor Carrier's business changed significantly when it was purchased by Intermodal. Prior to that time, Motor Carrier received revenue of over $ 1 million from leasing the Kearny Site to third parties, whereas thereafter, Motor Carrier had no revenue at all. Moreover, given its lack of revenue and acknowledged responsibility under the Agreement for (at least some) environmental contamination at the Kearny Site, it is difficult to conclude that Motor Carrier's resources were reasonable "in

12

relation to the nature of the business of the corporation and the risks attendant to such businesses." Id.

As to the second veil-piercing prong, we note a New Jersey appellate court decision that explained that, "the hallmarks of . . . abuse [of the corporate form] are typically the engagement of the subsidiary in no independent business of its own but exclusively the performance of a service for the parent and, even more importantly, the undercapitalization of the subsidiary rendering it judgment-proof." OTR Assocs. v. IBC Servs., Inc., 801 A.2d 407, 409-10 (N.J. Super. Ct. App. Div. 2002). As Pharmacia stresses, both of these hallmarks are present here. Intermodal used Motor Carrier solely to hold the Kearny Site for its business (without payment), thereby shielding Intermodal from any potential liability arising out the environmental harms caused by Pharmacia's former operations. Moreover, Motor Carrier has pointed to no evidence that it has the resources necessary to meet those liabilities.

In sum, the District Court properly concluded that Motor Carrier's corporate veil should be pierced as a matter of law. Therefore, Intermodal is liable for Motor Carrier's obligations under the Agreement.

Although counsel for Motor Carrier assured this court at the oral argument that Intermodal has the resources to meet the indemnity obligation, we nonetheless examine the District Court's holding that CSX became an "Assurance Affiliate" upon completion of Intermodal's stock purchase of Motor Carrier in January 1998 because Motor Carrier's

13

auditor valued Motor Carrier at only about $340,000 in October 1997.

Section 13.19 of the Agreement provides that, if at the end of any quarter the net worth of Motor Carrier falls below $5 million, then Motor Carrier must promptly notify Pharmacia and within fifteen days "cause Affiliates to become Assurance Affiliates by causing them (in a form satisfactory to [Pharmacia]) to become parties to this Agreement, to guaranty and/or to otherwise become liable for the obligations under the Agreement . . . to the same extent as [Motor Carrier], in each case as [Pharmacia] may elect." App. at 2459-60.

Even if Intermodal somehow became an Assurance Affiliate, nothing in § 13.19 provides that Intermodal's corporate parent, CSX, would automatically become an Assurance Affiliate as well. Section 13.19 provides that once an Assurance Affiliate is added, its net worth is considered part of Motor Carrier's net worth "for purposes of determining a need thereafter to add additional Assurance Affiliates." App. at 2460. The District Court made no finding (and Pharmacia offers no evidence) that the combined net worth of Intermodal and Motor Carrier fails to exceed $5 million. Therefore, there is no basis upon which to conclude that CSX would be obligated to become an Assurance Affiliate.

In sum, the District Court erred in concluding that CSX became an Assurance Affiliate of Motor Carrier under the Agreement. Thus, CSX is not directly liable for Motor Carrier's indemnification obligations.

14

## VI.

For the above-stated reasons, we will affirm the District Court's judgment that Motor Carrier and Intermodal are required to indemnify Pharmacia for costs incurred in response to the EPA, NJDEP, and NOAA investigations. We will reverse the District Court's judgment that CSX was responsible for those costs.